95 Cal.Rptr.2d 357 (2000)
80 Cal.App.4th 804
The PEOPLE, Plaintiff and Respondent,
v.
Frederick R. TAYLOR, Defendant and Appellant.
No. B128957.
Court of Appeal, Second District, Division Seven.
May 2, 2000.
As Modified May 22, 2000.
Review Granted August 23, 2000.
*359 Daniel G. Koryn, under appointment by the Court of Appeal, San Diego, for Defendant and Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, Jaime L. Fuster, Deputy Attorney General, for Plaintiff and Respondent.
*358 JOHNSON, Acting P.J.
Defendant Frederick Taylor was convicted of possessing a rock of cocaine weighing 0.04 grams along with a pipe to smoke it in. He was sentenced to 25 years to life in state prison under the "three strikes" law (Pen.Code, § 667, subds.(b)(i)).[1] We affirm the conviction but vacate the sentence and remand the cause to the trial court for reconsideration of whether to dismiss one or more of Taylor's prior strike allegations under section 1385.

FACTS AND PROCEEDINGS BELOW
Police officers arrested Taylor after they found him in possession of a rock-like substance, which they suspected contained cocaine, and a glass pipe commonly used for smoking "rock cocaine." An analysis of the rock itself showed it weighed 0.04 grams and contained cocaine but the criminalist conducting the analysis did not determine the amount of actual cocaine contained in the rock.
Taylor represented himself at trial.
The arresting officers testified they were certified as drug recognition experts who had made hundreds of arrests for possession and sale of drugs. In their expert opinions the rock found in Taylor's possession was of "very common size and amount for personal use" and "enough to get high off of." In response to a question from the jury, the trial court instructed: "There is no minimum amount of cocaine necessary to be criminal. The test is whether it was `in an amount sufficient to be used as a controlled substance.'"
The trial court instructed the jury under CALJIC No. 17.41.1 "the integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves *360 as required by these instructions" and to report to the court any juror who expresses an intent to disregard the law.
A jury convicted Taylor of possessing a controlled substance and a smoking device. (Health & Saf.Code, §§ 11350, subd. (a), 11364.) Taylor waived his right to a jury trial on allegations of prior convictions and the trial court found he had suffered convictions for robbery and assault with a deadly weapon both of which constitute serious or violent felonies for purposes of the "three strikes" law. Before and after trial, Taylor requested the court to dismiss one or both of the "strike" allegations. These requests were denied and he was sentenced to 25 years to life for possession of a controlled substance and a concurrent term of 180 days for possession of the smoking device.

DISCUSSION

I. EVEN IF THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE "USEABLE AMOUNT" ELEMENT OF A DRUG POSSESSION CHARGE, THE ERROR WAS HARMLESS.

The trial court correctly instructed the jury under CALJIC No. 12.00 that in order to establish the offense of possession of a controlled substance in violation of Health & Safety Code section 11350, subdivision (a) the People had to prove "the substance was in an amount sufficient to be used as a controlled substance."
On the second day of deliberations, the jury submitted these questions to the trial court: "What is the amount (weight) required by Code to be a crime? Is the minimum amount stated? After conferring with the parties, the court responded: "There is no minimum amount of cocaine necessary to be criminal. The test is whether it was `in an amount sufficient to be used as a controlled substance.'" (Emphasis added.) Taylor argues the italicized portion of the trial court's response was erroneous because in People v. Rubacalba (1993) 6 Cal.4th 62, 66, 23 Cal. Rptr.2d 628, 859 P.2d 708, the court held the "useable amount" rule prohibits conviction "when the substance possessed simply cannot be used, such as when it is a blackened residue or a useless trace." The trial court's response, he maintains, allowed the jury to convict him of possession even if the amount he possessed was a mere "useless trace."
The People initially argue Taylor waived any error in the trial court's response by failing to object at the time the court was considering its response. We reject this argument. Because the trial court's instruction on the "useable amount" element affected Taylor's substantial rights, no objection was necessary. (§ 1259.) Furthermore, Taylor did object to the trial court's response, arguing it did not adequately address the jury's concern which he correctly perceived to be whether such a small amount as 0.04 grams could constitute an offense. Taylor suggested the jury should be instructed the minimum amount of cocaine necessary to constitute a crime is an amount sufficient to affect the central nervous system or produce a narcotic effect. Although the trial court correctly rejected such an instruction (People v. Piper (1971) 19 Cal.App.3d 248, 250, 96 Cal.Rptr. 643), Taylor did enough to preserve the court's response as an issue on appeal.
We agree with the People, however, the trial court's response was not erroneous. Telling the jurors "the amount required by [the law] to be a crime" is "an amount sufficient to be used as a controlled substance" is equivalent to telling them possession of an amount that is "useless" is not a crime. While it might have been better to respond in the language of Rubacalba, supra, we find the trial court's response adequate and not misleading.
Even if the trial court's response to the jury's question could be viewed as technically incorrect, the error was harmless in this case. In People v. Piper, supra, *361 the court held a controlled substance is "useable" if it could be used in any manner "customarily employed" by users of the substance. (19 Cal.App.3d at p. 250, 96 Cal.Rptr. 643.) Here, both police officers testified, based on their experience making hundreds of drug arrests, the rock Taylor possessed was similar to rocks commonly used for personal use and "enough to get high off of," thereby satisfying the useable amount test of Piper as well as the "narcotic effect" test urged by Taylor.

II. TAYLOR WAS NOT PREJUDICED BY THE TRIAL COURT'S "ANTI-NULLIFICATION" INSTRUCTION.

The trial court instructed the jury under a recently developed CALJIC instruction (CALJIC No. 17.41.1, quoted below) which appears to be intended, at least in part, to stamp out the centuries-old practice known as "jury nullification" in which jurors refuse to apply a law they perceive to be unjust or to produce an unfair result and instead render a verdict consistent with their collective conscience. (See 2 LaFave & Israel, Criminal Procedure (1984) Right to Jury Trial, § 21.1(g), pp. 700-702; Gunther, The Jury in America (1988) Jury Justice, p. 219 ff.)
In an 1893 case, our Supreme Court described jury nullification as a "naked power" possessed by the jury (People v. Lem You (1893) 97 Cal. 224, 228, 32 P. 11) but it is more than that. The exercise of a "naked power" normally can be reversed or corrected or at least punished. In criminal cases, however, trial courts may not enter a judgment of conviction after acquittal by a jury or grant the prosecution a new trial; nor can the prosecution seek appellate reversal of an acquittal; and, by common law rule, jurors who engage in nullification are not subject to punishment. (Bushell's Case (K.B.1670) 124 Eng. Rep. 1006, 1012-1016; see Clark v. United States (1933) 289 U.S. 1, 17-18, 53 S.Ct. 465, 77 L.Ed. 993, In re Cochran (1924) 237 N.Y. 336,143 N.E. 212, 212-213, Bays v. Petan Co. (D.Nev.1982) 94 F.R.D. 587, 591.) Therefore, rather than a mere "naked power" to ignore the law, jury nullification is more in the nature of a prerogative not to apply politically ordained criminal sanctions which conflict with the community's conscience. (United States v. Dougherty (D.C.Cir.1972) 473 F.2d 1113, 1131.) As previously noted, this prerogative is deeply embedded in Anglo-American jurisprudence.[2] (Conrad, Jury Nullification (1998) pp. 13-60, a Cato Institute book.)
CALJIC No. 17.41.1 instructs the jury, in relevant part:
"The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror ... expresses an intention to disregard the law or to decide the case based on ... any [other] improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation."[3]
Up until now, courts have followed a "don't askdon't tell" policy with respect to jury nullification. Criminal juries are not asked to explain their verdicts. Indeed, asking a criminal jury to explain the *362 reasoning behind its verdict has been condemned as repugnant to the constitutional guarantees of due process and trial by jury. (United States v. Spock (1st Cir. 1969) 416 F.2d 165, 180-183.)[4] On the other hand, no case in California or any other jurisdiction so far as we know has held a trial court must instruct a jury it has the power of nullification. (People v. Sanchez (1997) 58 Cal.App.4th 1435, 1444-1445, 69 Cal.Rptr.2d 16.)
Through this policy, courts have managed to balance two fundamental but competing principles: juries ought to follow the law[5] but juries should be able to protect defendants from oppressive prosecutions.[6] (See Conrad, supra, pp. 137-138, 287, 300.) Thus, courts criticize jury nullification as "civil disobedience" (People v. Dillon (1983) 34 Cal.3d 441, 487, fn. 39, 194 Cal.Rptr. 390, 668 P.2d 697) and "abuse of power" (see People v. Gottman (1976) 64 Cal.App.3d 775, 780, 134 Cal.Rptr. 834) while at the same time characterizing juries as "`the conscience of the community'" (People v. Jones (1997) 15 Cal.4th 119, 186, 61 Cal.Rptr.2d 386, 931 P.2d 960; citation omitted) and "`instruments of public justice'" (People v. Lesara (1988) 206 Cal. App.3d 1304, 1308, 254 Cal.Rptr. 417; citation omitted.)
The challenged instruction threatens to upset the existing balance between jurors as upholders of the law and jurors as the conscience of the community.
While 17.41.1 does not explicitly tell jurors they lack the power to nullify, it certainly goes beyond anything California trial courts have done in the past to discourage juries from exercising this power. Jurors traditionally have been instructed they have a "duty to follow the law." (See CALJIC No. 1.00.) However, by telling the jurors the integrity of the judicial process depends on their following the court's instructions, instruction 17.41.1 casts the jurors' duty to follow the law in a moral framework. In addition, the new instruction implicitly tells the jurors they have a moral obligation to report any fellow juror who expresses an intention to disregard the law or decide the case on any "improper basis" including, presumably, the juror's conscience.
It is surely a debatable proposition that jurors have a moral obligation to follow the law as announced to them by the trial court and to "report" on those who express an intention to do otherwise.[7] But moral issues aside, instruction 17.41.1 poses more practical problems in the conduct of criminal trials.
The instruction threatens to interfere with the jury's independent deliberations thereby depriving the defendant of the Sixth Amendment right to a fair trial.
*363 Although the instruction does not explicitly threaten to punish a juror who refuses to follow the law, the fact it leaves the consequences of doing so unstated may well serve as an even stronger deterrent to jury nullification.[8] But the cost of that deterrent may be to stifle free and open discussion and expression of ideas, especially unpopular ones, during deliberations. Some jurors may feel intimidated by the knowledge their comments, suggestions and ideas may be reported to the judge and may even become public. This could lead jurors to suppress or edit their opinions to ensure they are being "politically correct" and to avoid coming to the attention of the court.
Furthermore, the jurors in the majority may use the instruction as leverage against those in the minority by threatening to report them to the trial court as "nullifiers" if they do not change their position on the verdict. At the very least, the requirement jurors report to the court their fellow jurors whom they believe intend to disregard the law increases the likelihood of dissension among the jurors. Turning jurors into "snitches" can only exacerbate the misunderstandings, mistrust, rivalries and tensions which commonly arise during deliberations. There is a thin line between refusal to deliberate, refusal to follow the law and being unpersuaded by the prosecution's evidence. It is sometimes difficult for a trial judge, much less lay jurors, to determine which one of these is the true state of affairs in any given deliberation. Absent the "snitch" provision in instruction 17.41.1 the jurors probably would be more likely to try to work out their differences in the jury room. But instruction 17.41.1 encourages frustrated jurors to manufacture misconduct by holdouts in order to end a stalemate. (See United States v. Thomas, supra, 116 F.3d at p. 622; King, Silencing Nullification Advocacy Inside the Jury Room and Outside the Courtroom (1998) 65 U. Chi. L.Rev. 433, 489, hereafter "Silencing Nullification.")
Of course, once a report reaches the trial judge that a juror is considering nullification, some form of intervention is inevitable. A judge receiving a report a juror is refusing to follow the law has several options. These include ordering further deliberations, rereading instructions, or attempting to clarify disputed points of law revealed in questions from the jurors. Such neutral efforts to get deliberations back on track are not objectionable and may work. (See e.g., People v. Pride (1992) 3 Cal.4th 195, 265, 10 Cal.Rptr.2d 636, 833 P.2d 643.) But there is also a danger intrusion into deliberations by a judge bent on discouraging nullification could be so extensive or one-sided that some jurors may be indirectly coerced into abandoning their genuine doubts about the sufficiency of the prosecution's evidence. (United States v. Thomas, supra, 116 F.3d at p. 620; Silencing Nullification, supra, 65 U. Chi. L.Rev. at p. 485.)
Instruction 17.41.1 might also lead to the denial of a defendant's right to a verdict by a unanimous jury. (Cal. Const., art. 1, § 16.) If the trial court removes a nullifying juror it sends a strong message to the remaining jurors the court endorses their proclivity for conviction and they should hold out for a guilty verdict. Under these circumstances the replacement juror, even if convinced the prosecution has failed to prove its case, will be hard pressed to sway the original eleven. She might not even try, believing that taking a stand contrary to the majority will only lead to her removal as a "nullifier." (See Perez v. Marshall (9th Cir.1997) 119 F.3d 1422, 1429 (D. Nelson, J., dissenting.) Thus, although the trial court is not permitted to direct a verdict for the prosecution it may do indirectly what it cannot do directly. Arguably, the same principle *364 that denies judges the discretion to direct guilty verdicts should also operate to deny judges the discretion to dismiss nullifying jurors. (Lynch, Judge vs. Jury (Jan.2000) California Lawyer 23, 23.)
The use of CALJIC 17.41.1, however, does not require reversal in the present case. There was no jury deadlock; there were no holdout jurors; there was no report to the court of any juror refusing to follow the law. In short, there was no indication the use of instruction 17.41.1 affected the verdict in any way. A further assessment of the instruction's validity is better left to a case where it has actually come into play.[9]

III. THE TRIAL COURT ABUSED ITS DISCRETION BY CONSIDERING INAPPROPRIATE FACTORS IN DENYING TAYLOR'S MOTION TO DISMISS THE PRIOR STRIKE ALLEGATIONS UNDER SECTION 1385.

Taylor had previously been convicted of two violent or serious felonies within the meaning of the "three strikes" law: a robbery in 1991 and assault with a deadly weapon (a pair of scissors) in 1992. He was on parole when he was arrested for possession of 0.04 grams of cocaine in 1998 which led to the current conviction and a sentence of 25 years to life under the "three strikes" law. (§ 667, subd. (e)(2)(A).)
The trial court denied Taylor's motion to dismiss the allegations of one or both of his "strikes" in furtherance of justice under section 1385. (People v. Superior Court (Romero) (1996) 13 Cal.4th 497, 53 Cal.Rptr.2d 789, 917 P.2d 628.) On appeal, Taylor contends the trial court abused its discretion in denying his motion and sent him to prison for life for being a bad lawyer and a public nuisance.
A split of authority exists as to whether the denial of a request to dismiss a strike under section 1385 is appealable. The majority of courts have found such an order is appealable. (People v. Stone (1999) 75 Cal. App.4th 707, 716-717, 89 Cal.Rptr.2d 401; People v. Myers (1999) 69 Cal.App.4th 305, 309-310, 81 Cal.Rptr.2d 564; People v. Gillispie (1997) 60 Cal.App.4th 429, 433-434, 70 Cal.Rptr.2d 462; cf. People v. Lloyd (1998) 17 Cal.4th 658, 664-665, 72 Cal. Rptr.2d 224, 951 P.2d 1191 [appeal lies from trial court's refusal to exercise its discretion to dismiss "strike" under section 1385]; but see contra People v. Benevides (1998) 64 Cal.App.4th 728, 734, 75 Cal. Rptr.2d 388.) We believe the majority view is correct. Furthermore, even under People v. Benevides, supra, if the trial court expresses "clearly improper reasons" for refusing to dismiss a "strike" the appellate court "must correct the error." (64 Cal.App.4th at p. 735, fn. 6, 75 Cal.Rptr.2d 388.)
Rulings on Romero motions are reviewed for abuse of discretion. (People v. Myers, supra, 69 Cal.App.4th at 309, 81 Cal.Rptr.2d 564.) Discretion is abused where the trial court's decision is "irrational or arbitrary." (Id. at pp. 309-310, 81 Cal.Rptr.2d 564.) Discretion is also abused when the trial court's decision to strike or not to strike a prior is based on improper reasons (Romero, supra, 13 Cal.4th at p. 531, 53 Cal.Rptr.2d 789, 917 P.2d 628; People v. Benevides, supra, 64 Cal.App.4th at p. 735, fn. 6, 75 Cal.Rptr.2d 388) or the decision is not in conformity with the "spirit" of the law (People v. Williams (1998) 17 Cal.4th 148, 161, 69 Cal.Rptr.2d 917, 948 P.2d 429; People v. Myers, supra, 69 Cal.App.4th at p. 310, 81 Cal.Rptr.2d 564.)
In People v. Williams, the Supreme Court held that in ruling on a Romero motion the trial court "must consider *365 whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (17 Cal.4th at p. 161, 69 Cal.Rptr.2d 917, 948 P.2d 429.) It is undisputed the trial court in the present case considered these factors in ruling on Taylor's motion to dismiss his prior "strikes." However, as we explain below, in refusing to strike either of Taylor's prior convictions the court also considered factors which were improper because they bore no relationship to "the interests of society" as expressed in the "three strikes" law. (Romero, supra, 13 Cal.4th at p. 530, 53 Cal.Rptr.2d 789, 917 P.2d 628.) In view of the fact this is a close case and we cannot determine whether the trial court would have reached the same result had it not considered these improper factors, we vacate the sentence and remand the matter to the trial court for reconsideration of Taylor's motion. (Cf. People v. Covino (1980) 100 Cal.App.3d 660, 670-672, 161 Cal.Rptr. 155 and cases cited therein.)
As the trial court acknowledged, there were a number of factors supporting a dismissal of one or more of Taylor's "strikes." The present felony was "minor," involving a "miniscule amount" of drugs. The present felony did not involve violence. The present felony did not place any person or property in danger. Taylor was employed and productive for the majority of the year prior to his current arrest. He had "strong support from many friends and family members."
On the other hand, the trial court identified two factors it believed militated against granting Taylor's motion. His two prior strikes, a 1991 robbery conviction and a 1992 conviction for assault with a deadly weapon were not "remote in time" from his 1998 drug arrest and he was on probation at the time of his current drug arrest.
However, what tipped the balance against Taylor were two factors which had nothing to do with the nature and circumstances of his present crime, his prior felony convictions, or the particulars of his background, character, and prospects. (People v. Williams, supra, 17 Cal.4th at p. 161, 69 Cal.Rptr.2d 917, 948 P.2d 429.)
After reviewing the above-stated factors for and against striking the priors, the court launched into an attack on Taylor for the way he had conducted his pro per defense.
The court accused Taylor of misconduct in appealing to the jury for sympathy. The court stated Taylor had misled the jury in telling them he had been in custody for six months awaiting trial "when you well [knew] that that was only because you continued the case.... [Y]ou're telling the jury your rights have been violated, you were in custody for six months, and that was outrageous." The court also noted Taylor told the jury he was defending himself because he could not afford an attorney when in fact he had a court-appointed standby counsel at his side throughout the trial and had been provided by the court with funds for telephone calls, postage and to hire an investigator. In addition, Taylor told the jury he was concerned about the amount of time he was facing if convicted and, while the jury was passing through the courtroom during a break in deliberations, Taylor "loudly said: Please don't take my life."
Taylor's other misconduct cited by the court included calling one of the police officer witnesses "a liar" and attempting to use his opening statement and closing argument as testimony in lieu of taking the stand himself.
After describing these instances of misbehavior, the trial court asked Taylor: "Now tell me why that deserves any kind of consideration on my part that you have corrected your [past criminal behavior]. *366 ... I don't see that you're deserving of any leniency." Taylor responded he was "desperate" and gave a long account of his past life and his efforts at rehabilitation. The court then reacted with more criticism of Taylor's courtroom behavior, telling Taylor he had not "adhere[d] to the rules": "You cheated throughout the trial. You cheated in your opening statements to the jury, you cheated during the presentation of the evidence, cheated during your argument to the jury at the end, and you cheated after they were selected and they were going out pleading with them not to take your life, telling them this was a life sentence and not to take your life.... Nothing that you've done has shown me that you can correct your conduct in the future. And that's what three strikes is all about."
The trial court's remarks during the hearing on the Romero motion also show the court denied the motion because it viewed Taylor as a public nuisance who should be removed from the streets. The court made this point not just once but five times in the course of the hearing:
"Now, if you're addicted, why don't you go to your own residence or behind a building someplace and smoke it and consume it in private instead of on a street where this is a main problem?"
"Five days out of prison you're on the street ready to smoke cocaine in public. If you've got a problem with addiction, go someplace in private and feed that addiction."
"[The cocaine] was a very minuscule amount, but it was an aggravated circumstance in which you're doing this in open public."
"You were on parole for five days when you committed this incident, and this was in open public, again back on drugs."
"[The present offense is] not a big problem, but you should have done it in private, not in public."
In People v. Williams our Supreme Court made it clear that in ruling whether to strike a prior felony conviction "in furtherance of justice," and in reviewing such a ruling, the trial and appellate courts must take their concept of justice from the "three strikes" law itself, "informed by generally applicable sentencing principles." (17 Cal.4th at pp. 160, 161, 69 Cal.Rptr.2d 917, 948 P.2d 429.) These "generally applicable sentencing principles," involve a balancing of the defendant's constitutional rightsincluding the guaranty against disproportionate punishmentand society's legitimate interestswhich embrace the fair prosecution of properly charged crimesas well as other factors "intrinsic to the [statutory] scheme, such as the nature and circumstances of the defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects." (Ibid.) The court further held that in determining whether "the defendant may be deemed outside the [statutory] scheme's spirit, in whole or in part," "no weight whatsoever may be given to factors extrinsic to the [statutory] scheme." (Id. at p. 161, 69 Cal.Rptr.2d 917, 948 P.2d 429; emphasis added.)
We fail to see how Taylor's amateurish mistakes in conducting his own defense have any bearing on the question whether he may be deemed outside the spirit of the "three strikes" law, in whole or in part. The trial court attempted to make Taylor's actions during the trial a "character" issue (see Williams, supra, 17 Cal.4th at p. 161, 69 Cal.Rptr.2d 917, 948 P.2d 429) by accusing Taylor of failing to follow the "rules" of proper trial conduct and of "cheating" in his presentation to the jury. (Cf. People v. Superior Court (Alvarez) (1997) 14 Cal.4th 968, 978, 60 Cal.Rptr.2d 93, 928 P.2d 1171 [in exercising discretion whether to treat crime as "wobbler" court may consider defendant's "traits of character as evidenced by his behavior and demeanor at the trial"].) We perceive no correlation, however, between the way Taylor conducted his defense and the interests of society *367 in longer prison terms for repeat felons. (§ 667, subd. (b).)[10]
Furthermore, although there is no requirement the third "strike" be a serious or violent felony, we do not believe that in enacting the "three strikes" law the Legislature or the people intended the law be turned into a nuisance statute used as a way of ridding society forever of persons who are a mere public annoyance or embarrassment. (Cf. In re Lynch (1972) 8 Cal.3d 410, 105 Cal.Rptr. 217, 503 P.2d 921 [holding potential life sentence for indecent exposure constituted cruel and unusual punishment].) That the trial court was using the statute in this manner is apparent from the court's numerous references to Taylor smoking his small rock of cocaine in public rather than in his home. This is not what the Supreme Court had in mind when it instructed the trial courts to consider "the nature and circumstances" of the defendant's present felony. (Williams, supra, 17 Cal.4th at p. 161, 69 Cal.Rptr.2d 917, 948 P.2d 429.) Indeed, the power to dismiss prior strikes is intended to protect the defendant's right not to suffer disproportionate punishment. (Id. at p. 160, 69 Cal.Rptr.2d 917, 948 P.2d 429.) A sentence of life in prison for possession of 0.04 grams of cocaine is no more proportional to the crime because the possession occurred in public than if it had occurred in private.
For the reasons set forth above, we conclude the trial court abused its discretion in denying Taylor's motion to dismiss one or both of his prior strike allegations because it considered factors extrinsic to the statutory scheme. (See Williams, supra, 17 Cal.4th at p. 161, 69 Cal.Rptr.2d 917, 948 P.2d 429.) Because this is a close case and it is reasonably probable the trial court might have reached a more favorable decision had it not considered improper factors, the error was prejudicial. However, other than limiting itself to the factors discussed in Williams, supra, we express no view on how the trial court should exercise its discretion on remand.[11]

DISPOSITION
The judgment of conviction is affirmed. The sentence is vacated and the cause remanded to the trial court to reconsider whether to dismiss one or both of the prior strike allegations.
WOODS, J., concurs.
NEAL, J., Concurring and Dissenting.
I agree with and concur in that portion of the majority opinion which affirms appellant's conviction.
But I disagree with the majority's decision to remand for further sentencing proceedings. I believe the trial judge properly applied the relevant criteria in concluding that appellant was not "outside the spirit" of the Three Strikes sentencing scheme and therefore was ineligible to have a prior "strike" conviction dismissed, and his sentence reduced.
The majority criticizes the trial court for considering, appellant's dishonesty while conducting his defense (in propria persona), and his public use of cocaine shortly after release on parole from a prior prison term. The majority asserts these facts had "nothing to do with" appellant's character and prospects (People v. Williams (1999) 17 Cal.4th 148, 161, 69 Cal.Rptr.2d *368 917, 948 P.2d 429) and thus were irrelevant to deciding whether to dismiss a "strike."
On the contrary, appellant's dishonesty during trial, and his flagrant, public violation of the law shortly after release on parole, strongly evidence that his character is unreformed and unrehabilitated, that he has learned neither honesty nor respect for the law, and that his prospects for rehabilitation and a crime free future are poor. These facts were highly relevant to whether a "strike" should be dismissed, and the trial court in my view did not err in relying upon them.
NOTES
[1] All statutory references are to the Penal Code unless otherwise stated.
[2] The history of jury nullification is discussed in People v. Sanchez (1997) 58 Cal.App.4th 1435, 1453-1455, 69 Cal.Rptr.2d 16 (Johnson, J. dissenting) and the cases and materials cited therein.
[3] The People argue Taylor waived any challenge to this instruction by not objecting to it at trial. However, the instruction is one capable of affecting his substantial rights so no objection was required. (§ 1259; People v. Baca (1996) 48 Cal.App.4th 1703, 1706, 56 Cal.Rptr.2d 445.)
[4] In reversing the defendants' convictions in Spock the court noted, but did not rely on, the argument that questioning a criminal jury about its reasoning "`might be said to infringe ... on its power to follow or not to follow the instructions of the court.'" (416 F.2d at p. 181; citation omitted.)
[5] For a justification of this policy see (United States v. Thomas (2nd Cir. 1997) 116 F.3d 606, 614-617.)
[6] See, e.g., Duncan v. Louisiana (1968) 391 U.S. 145, 155-156, 88 S.Ct. 1444, 20 L.Ed.2d 491 [jury serves as safeguard against corrupt or overzealous prosecutors and biased, compliant or eccentric judges].)
[7] It can be argued jury nullification stems from a moral duty not to obey the law when the law is unconscionable. (See Gifford, The Conceptual Foundations of Anglo-American Jurisprudence in Religion and Reason (1995) 62 Tenn. L.Rev. 759, 759-768; Feinberg, The Right to Disobey (1989) 87 Mich. L.Rev. 1690,1702-1703; Litowitz, Jury Nullification: Setting Reasonable Limits (Sept. 1997) CBA Record 16, 21.)
[8] Few jurors will have ever heard of Bushell's Case, supra, much less know it prohibited punishment of a juror who refused to follow the trial court's instructions on the law or know this remains the commonly followed rule today.
[9] Taylor argues the jury's concern about the small amount of cocaine involved (see discussion, supra, at p. 359) suggests they might have engaged in nullification if not for instruction 17.41.1. We find this argument too speculative to justify overturning the verdict here even if we were to ultimately conclude the instruction is erroneous.
[10] Taylor's offenses of seeking sympathy from the jury and arguing facts not in evidence, while technical violations of the rules of trial conduct, are hardly the kinds of violent or disruptive conduct that would motivate Romero's "reasonable judge" to deny a motion to strike a prior conviction. (Romero, supra, 13 Cal.4th at pp. 530-531, 53 Cal.Rptr.2d 789, 917 P.2d 628.)
[11] In light of our decision to remand the matter of dismissing the "strikes" to the trial court for reconsideration, we need not address Taylor's contention his sentence constituted cruel and unusual punishment.