[No. D035066. Fourth Dist., Div. One. Aug. 2, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN RONALD BROWN, Defendant and Appellant.

**COUNSEL**

Roberta K. Thyfault, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Raquel M. Gonzalez and Patti W. Ranger, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BENKE, Acting P. J.**—John Ronald Brown was convicted by a jury of one count of second degree murder and one count of the unlawful practice of medicine. (Bus. & Prof. Code, § 2053.) He pleaded guilty to an additional seven counts of the unlawful practice of medicine. As to the unlawful practice of medicine count, the jury found true that appellant inflicted great bodily injury on a person 70 years of age or older within the meaning of Penal Code[1] section 12022.7, subdivision (c). Brown was sentenced to a prison term of 15 years to life. He appeals, arguing that as to the murder conviction, California was without jurisdiction to try him, the instructions on implied malice were inadequate, the court erred in instructing in the terms of CALJIC No. 17.41.1 and the court erred in imposing the great bodily injury enhancement as to the unlawful practice of medicine conviction returned by the jury.

FACTS

A. *Prosecution Case*

Gregg Furth and Philip Bondy, longtime friends, both suffered from apotemnophilia, the desire to have a limb amputated. Surgeons in the United States will not amputate the limbs of apotemnophiliacs. In 1996 Furth, a resident of New York, learned of appellant, a medical doctor, through a newspaper article about transsexual surgery and believed he might be willing to remove Furth's leg.

---

[1] All further statutory references are to the Penal Code.

Appellant received a medical degree in 1947. He twice failed the examination for board certification in general surgery and three times failed the examination for board certification in plastic surgery. Appellant's California medical license was revoked in 1977 for gross negligence. Appellant continued performing primarily "transgender reassignment surgeries" in Mexico. Appellant was not licensed to practice medicine in Mexico.

Appellant and Furth met in San Diego and discussed the amputation of Furth's leg. Appellant agreed to perform the surgery at a clinic in Tijuana. Appellant explained that after the surgery he would immediately bring Furth back to a hotel in the United States where he would care for him for three or four days. Furth returned to San Diego in the spring of 1997 and took a taxi to a clinic in Tijuana. The surgery was postponed, however, when the assisting Mexican physician learned the nature of the operation and refused to participate. On April 27, 1998, the two men met again in San Diego and Furth paid appellant a fee of $10,000. The men purchased crutches at a medical supply store in Chula Vista and then drove to a clinic in Mexico.

While waiting at the clinic, Furth decided he did not want the operation. Furth called his friend, 79-year-old Bondy, to arrange for Bondy to have the operation. Bondy told appellant that 10 years earlier he had undergone heart surgery. Appellant talked to Bondy on the telephone and told him he would have to come to San Diego for an assessment.

Bondy arrived in San Diego in early May 1998. On May 8, 1998, he and appellant went to a medical supply store in Chula Vista and purchased crutches. Appellant performed the amputation of Bondy's leg on May 9, 1998. On that day, after the surgery, Bondy called Furth from a hotel in National City. Bondy stated he was delighted his leg had been amputated but that he was having difficulty using the crutches and had fallen several times. Bondy did not sound well and Furth decided to fly to San Diego.

In the early morning of May 10, hotel security was called to Bondy's room. A security guard found Bondy naked, on the floor, leaning against the bed. As the guard helped Bondy onto the bed, he noticed one of his legs was missing and the stump was bloody. The guard was summoned to the room a second time that morning. Bondy asked the guard to assist him to the bathroom and back to bed. The guard did so, noting that the bed sheets were bloody and Bondy seemed to be in pain. When the guard asked Bondy if he wanted him to call paramedics, Bondy said "no," that someone was coming to get him the next day.

Furth arrived later in the day and checked into Bondy's hotel. Bondy seemed to be doing well. About midnight Furth went to Bondy's room. The

men talked and Furth left for the evening. The next morning Furth went to Bondy's room and found him dead.

An investigator for the medical examiner noted that Bondy's amputation wound was still draining blood and appeared discolored and swollen. The examiner did not find in the room any postoperative instructions or the items normally found with a person who had undergone an amputation.

Furth called appellant and told him Bondy had died. Appellant stated he was saddened but Bondy was "brittle."

Bondy died from gas gangrene, a condition associated with dirty surgical conditions and improper wound care. Gas gangrene is readily treatable but if untreated can kill within one to two days. The pathologist opined that Bondy was not a good candidate for surgery. He was extremely emaciated and was suffering from heart disease and pneumonia at the time of his death.

On May 18, 1998, appellant spoke with an investigator from the district attorney's office. Appellant stated that the day after the amputation, Bondy contacted him complaining of pain and bleeding. Appellant examined the wound, noted it was bleeding but not profusely and noted a blue tint which he associated with gangrene. Appellant did not call paramedics because he did not think the condition was significant. Appellant told Bondy to increase the amount of medication he was taking. Appellant was surprised to learn Bondy had died from gangrene. Appellant was aware gangrene could be treated with antibiotics but did not prescribe such medication for Bondy because this appeared to be a "clean case."

A senior investigator for the Medical Board of California had investigated appellant on several occasions since 1983. The investigator stated that with regard to Bondy's amputation, appellant was practicing medicine in California since he held himself out as competent physician to a person seeking his services while in this state.

Two of appellant's prior patients testified concerning the care given them. In 1995 a patient who had undergone transsexual surgery in Europe contacted appellant concerning reconstructive surgery on her labia. Appellant examined the patient before surgery but asked for no medical reports and did not take a medical history. The surgery was performed in Tijuana and there was no preoperative examination. The patient was given no pain medication, antibiotics or postoperative instructions. The reconstruction was a failure.

In 1997 a patient went to appellant for transsexual surgery. Appellant discussed the patient's physical and mental health but did not ask for any

medical reports. The surgery was performed in Tijuana. The patient remained in the clinic for three days after the operation. On returning home the patient developed complications almost causing her death and required surgery to correct serious problems caused by surgical errors made by appellant.

A plastic and reconstructive surgeon testified appellant's preoperative, operative and postoperative practices with regard to Bondy's amputation were seriously wanting in every respect. No competent physician would amputate a healthy leg for no medical reason. Surgery on Bondy, an elderly man with a history of heart disease, was particularly risky. The surgeon concluded that appellant's procedures with regard to Bondy's surgery endangered his life.

### B. *Defense Case*

Leo Newton met appellant when appellant was performing transsexual surgeries as a licensed physician. Newton was, at the time, a practicing chiropractor. Newton referred patients to Brown and observed many of his surgeries. Appellant performed a hernia operation and a cosmetic eye procedure on Newton. Newton was satisfied with both operations. Newton stated appellant had a reputation of doing excellent surgery at affordable prices.

Appellant performed cosmetic surgery for Patrice Baxter and several of her friends and family members. All the surgeries were successful and Baxter believed appellant a highly competent physician. Appellant used Baxter's home in Mexico for patient postoperative care. Appellant checked on those patients and never abandoned them.

### C. *Rebuttal*

Appellant had the reputation in the medical community for botching surgeries and abandoning patients.

### DISCUSSION

### A. *Jurisdiction*

Focusing exclusively on his act of removing Bondy's leg, an act that occurred in Mexico, appellant argues California lacked jurisdiction to prosecute him for murder since the crime did not occur in this state. Appellant argues in the alternative that if jurisdiction over such an offense exists after

the decision in *People v. Morante* (1999) 20 Cal.4th 403 [84 Cal.Rptr.2d 665, 975 P.2d 1071], it did not exist at the time of his crime and cannot be applied retroactively to his murder of Bondy.

### 1. *Law*

Section 27, subdivision (a)(1), states that a person may be punished "under the laws of this state" if he or she "commit[s], in whole or in part, any crime within this state." Pursuant to section 778a, subdivision (a), a person is punishable in the same manner as if the crime had been committed entirely within this state or the person does "any act" within this state "in execution or part execution" of an intent to commit a crime anywhere, culminating in its commission within or without the state.

These sections appear clearly to confer jurisdiction on the courts of this state when at least some part of a crime is committed in California. The matter was made less clear however when in *People v. Buffum* (1953) 40 Cal.2d 709 [256 P.2d 317], the court concluded no jurisdiction existed in this state to prosecute a charge of conspiracy unless acts in this state amount to an attempt to commit the underlying offense. (*Id.* at pp. 715-718.)

The language of the *Buffum* opinion was broad and appeared to require application of the "attempt rule" not only to the determination of jurisdiction in conspiracy cases but in all criminal cases. In *People v. Burt* (1955) 45 Cal.2d 311 [288 P.2d 503, 51 A.L.R.2d 948], however, the court, while affirming the application of the attempt rule to the crime of conspiracy, concluded the rule not applicable to the crime of solicitation. The court noted the crime of solicitation, unlike conspiracy, applies to a finite number of serious offenses that are crimes in all states. Thus, unlike conspiracy, there was no possibility that a defendant would be prosecuted in California for a conspiracy to commit an act that, while criminal here, was not criminal where the act would occur. (*Id.* at pp. 313-315.)

The *Burt* court stated the harm addressed in the crime of solicitation was the solicitation itself and not the harm that would result should the solicited crime be committed. Thus, the court reasoned, California had jurisdiction to prosecute solicitation when the solicitation took place in this state even if the target crime was to be committed elsewhere and even if no attempt to commit the underlying crime occurred in California. (*People v. Burt, supra,* 45 Cal.2d at pp. 313-314.)

In *People v. Anderson* (1961) 55 Cal.2d 655 [12 Cal.Rptr. 500, 361 P.2d 32], the court dealt with a jurisdictional issue involving charges of grand

theft and attempted grand theft (no conspiracy was charged). In that case the defendant made fraudulent representations within California to a resident of this state concerning a gambling scheme in Nevada. That resident withdrew cash in California and took it to Nevada. Further false representations were made there and the theft was completed in that state. The court concluded California had jurisdiction to prosecute the defendant since his acts in California amounted to an attempted theft and thus the crimes were commenced in this state. The court also relied, however, on the fact the victims were California residents and their property was located in this state. (*Id.* at pp. 661-662.)

*Buffum*'s attempt rule was the subject of much criticism by commentators. (See *People v. Morante, supra*, 20 Cal.4th at pp. 421-422.) Following *Buffum, Burt* and *Anderson*, Courts of Appeal generally, but not uniformly, construed restrictively the jurisdiction of this state to prosecute offenses started here but completed elsewhere. (See *People v. Morante, supra*, 20 Cal.4th at pp. 421, fn. 10, 438.)

So the matter stood until our Supreme Court in *People v. Morante, supra*, 20 Cal.4th 403, overturned its decision in *Buffum*. In *Morante* the defendant was convicted of both conspiracy to violate various drug offenses and specific drug offenses. Conviction of the drug offenses was based on an aiding and abetting theory. The agreement supporting the conspiracy charge was entered into in California, acts in furtherance of the conspiracy, but not amounting to an attempt, were committed in this state and the defendant's acts in this state aided and abetted the underlying offenses. The drug offenses, however, were committed elsewhere. The issue was whether California had jurisdiction to prosecute the defendant for the conspiracy and the underlying offenses. (*Id.* at pp. 409-415.)

In *Morante* the court concluded that the *Buffum* attempt rule was "inconsistent with the principles that define the crime of conspiracy and the rationale for punishing the commission of that offense, does not conform to the legislative intent expressed in sections 27, subdivision (a)(1), and 778a, subdivision (a), regarding the scope of California's jurisdiction, is not mandated by other doctrines or provisions constraining state jurisdiction over criminal conduct that may involve more than one jurisdiction, and does not accommodate considerations of public policy that have assumed greater importance in recent years." (*People v. Morante, supra*, 20 Cal.4th at p. 422.) A conspiracy in California to commit an offense in another jurisdiction may be prosecuted here even if there is no attempt to commit the underlying offense in this state. (*Id.* at pp. 422-423.)

The court then addressed whether California had jurisdiction to prosecute the defendant for drug offenses when the crimes occurred out of state, the

defendant aided and abetted those crimes in California, but no attempt occurred here. The court noted that section 27, subdivision (a)(1), affords jurisdiction over crimes partially committed in this state and section 778a, subdivision (a), affords jurisdiction over crimes committed outside the state if the defendant formed the intent and committed "any act" within the state in whole or partial execution of that intent. The court reviewed the defendant's acts within California that aided and abetted the crimes completed out of state and concluded jurisdiction existed here to prosecute him for those offenses. (*People v. Morante, supra*, 20 Cal.4th at pp. 432-437.)

In doing so the court noted a general theoretical concern expressed in *Buffum* that without the jurisdictional requirement for an in-state attempt, the possibility existed that the acts committed here were so de minimis that California would nonetheless lack jurisdiction. The court concluded that theoretical concern had no meaning when, as in the case before it, "[the] preparatory acts (coupled with the requisite intent) clearly constituted more than de minimis acts toward the eventual completion of the offenses." (*People v. Morante, supra*, 20 Cal.4th at p. 436.) The jurisdiction to prosecute a crime based on an aiding and abetting theory, therefore, does not require an attempt to commit the crime in California. Jurisdiction exists, rather, when the defendant in this state engages in non de minimis preparatory acts with the intent of aiding the completion of a crime. (*Ibid.*)

Having concluded that an in-state attempt was not a sine qua non of jurisdiction, the court addressed the issue of whether that rule was to be given retroactive effect. The court noted that a judicial enlargement of a criminal statute that is not foreseeable, when applied retroactively, operates essentially as an ex post facto law and denies due process. The court stated: " '[A] state Supreme Court, no less than a state Legislature, is barred from making conduct criminal which was innocent when it occurred, through a process of judicial interpretation. "If a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect. [Citation]" ' [Citation.]" (*People v. Morante, supra*, 20 Cal.4th at p. 431.)

The court in *Morante* concluded that given the long-standing and clearly expressed rule that jurisdiction over the prosecution of a conspiracy required an attempt in this state to commit the target offense, it would be a denial of due process to apply a new and contradictory rule retroactively. (*People v. Morante, supra*, 20 Cal.4th at pp. 431-432.)

The court reached a different conclusion with regard to the retroactive effect of its rule that no attempt in this state is necessary before a crime,

completed elsewhere, may be prosecuted on an aiding and abetting theory in California. With regard to the *Buffum* rule, the court stated: "As we have seen, *Buffum*'s holding itself was rendered in the context of the crime of conspiracy. [Citation.] In *Burt*, we declined to extend *Buffum*'s requirement to a similar crime, that of solicitation, while indicating that the requirement was restricted to conspiracy. [Citation.] Thereafter, in *Anderson*, we merely noted that the evidence of initial in-state misrepresentations was sufficient in that case to find an attempt within the state to commit larceny by fraud, trick or device, while emphasizing that the assertion of our jurisdiction was supported by the additional factors that the victims and their property originally were present in California. [Citation.] Thus, it does not appear that this court previously had announced, or applied consistently, a rule that an attempt to commit the underlying offense must occur within this state regardless of the type of underlying offense, and regardless of the theory of liability. [Citations.] Although some Courts of Appeal have read *Buffum* expansively [citation], that tendency has not been universal. [Citation.]" (*People v. Morante, supra,* 20 Cal.4th at p. 438.)

The court additionally noted: "Moreover, unlike the many cases in which an assertion of jurisdiction might be unexpected because the defendant, originally having been within this state, travels to another jurisdiction to commit the great majority of the acts related to the offense, in the present case defendant's ongoing direct involvement and assistance following her initial conduct, all from her location within California, involved acts that she reasonably could anticipate would be proscribed under California law. [Citation.] Therefore, our determination on this issue may be applied to defendant, unlike the new interpretation of our jurisdiction over the offense of conspiracy that we have enunciated above." (*People v. Morante, supra,* 20 Cal.4th at p. 438.)

### 2. *Discussion*

We conclude California had jurisdiction to prosecute appellant for murder. *Morante* holds that jurisdiction to prosecute in California a crime completed elsewhere is not dependent on the commission in this state of an attempt to commit the offense. Rather, it is necessary only that in this state there be non de minimis preparatory acts done with the intent of completing the crime.

Appellant conducted an unlawful practice of medicine in this state. As a part of that practice he made preparations here for the amputation of Bondy's leg. Appellant met Bondy in California and the two went from here to Mexico for the procedure. Having removed Bondy's leg, appellant brought him back to this state for postoperative treatment. Bondy died in this

state while still, at least nominally, in appellant's care. With the state of mind required for a conviction of implied malice murder, appellant carried out in this state non de minimis acts of preparation and direct involvement such that California had a clear interest in and legitimate basis to prosecute him for murder.

While appellant's crime was committed before the decision in *Morante,* he is not denied due process by application of its jurisdictional rule to him. As our Supreme Court noted in *Morante,* the *Buffum* attempt rule was never announced or consistently applied by it to any crime or theory of liability except conspiracy. While some Courts of Appeal may have done so, such application was not universal. Moreover, as in *Morante,* prosecution in California could not have been unexpected. The procedures were planned in California and postoperative treatment was carried out in this state. Appellant's contacts with this state related to his crime were continuous and he could reasonably anticipate prosecution for that crime in California.

B.   *Implied Malice Instruction*

█   Appellant, in a rambling argument, contends the trial court erred in refusing to modify the standard CALJIC instructions on implied malice. He contends the standard instructions did not adequately inform the jury of the heightened mental state required for a finding of implied malice when death results from an inherently dangerous surgical procedure.

1.   *Background*

a.   *Instructions Given*

In relevant part as given, CALJIC No. 8.31 states:

"Murder of the second degree is the unlawful killing of a human being when:

"1. The killing resulted from an intentional act,

"2. The natural consequence of the act are dangerous to human life, and

"3. The act was deliberately performed with the knowledge of the danger to, and with conscious disregard for, human life.

"When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being."

The court instructed the jury that involuntary manslaughter was a lesser included offense of murder and that if the jury was not satisfied appellant

was guilty of murder, it could convict him of manslaughter. Using CALJIC No. 8.45, the trial court explained that the unlawful killing of a person, without malice aforethought and without the intent to kill, is involuntary manslaughter. The court told the jury a killing is unlawful if it occurred "[i]n the commission of an act, ordinarily lawful, which involves a high degree of risk of death or great bodily harm, without due caution and circumspection."

The court explained, using CALJIC Nos. 3.35, 3.36 and 8.46, that in the crime of involuntary manslaughter, there must exist a joint operation of an act and criminal negligence. Criminal negligence was defined as more than ordinary negligence. Criminal negligence is "acts which are aggravated, reckless or flagrant and which are such a departure from what would be the conduct of an ordinary prudent, careful person under the same circumstances as to be contrary to a proper regard for human life or danger to human life or to constitute indifference to the consequences of those acts." The court explained that the consequences of the acts must have been reasonably foreseen and "that the death was not the result of inattention, mistaken judgment or misadventure but the natural and probable result of an aggravated, reckless or flagrantly negligent act."

The court, using CALJIC No. 8.51, explained the difference between implied malice murder and involuntary manslaughter in these terms: "There are many acts which are lawful but nevertheless endanger human life. If a person causes another's death by doing an act or engaging in conduct in a criminally negligent manner, without realizing the risk involved, he is guilty of involuntary manslaughter. If on the other hand, the person realized the risk and acted in total disregard of the danger to life involved, malice is implied, and the crime is murder."

b. *Request for Modification*

At the instructions conference, defense counsel stated his concern that the current version of CALJIC No. 8.31 and its definition of implied malice, while adequate for most cases, was inadequate when death resulted from a surgical procedure. Counsel noted there was evidence that all surgical procedures, even the simplest, are potentially life threatening. He argued given that fact the present version of CALJIC No. 8.31's requirement of a "conscious disregard for . . . human life" should be modified by replacing it with or adding to it the requirement the act be done "for a base, antisocial

motive and with wanton disregard for human life."[2] It is not entirely clear why counsel believed the inherent dangers of surgery made the requested modification necessary.

It is unclear exactly what instruction counsel wished the trial court give. The clerk's transcript contains no requested instructions. Counsel's discussion of the requested instruction was theoretical and did not include a statement of the exact language sought. It appears, however, counsel was asking that the paragraph of the current version of the instruction stating that the intentional act resulting in death must be "deliberately performed with knowledge of the danger to, and with conscious disregard for, human life" be replaced with language from the 1983 version of the CALJIC instruction stating that the act must have been "done for a base, antisocial purpose and with a wanton disregard for human life." (CALJIC No. 8.31 (1983 rev.) (4th ed. 1979).)

The trial court denied the request and instructed in the terms of the current versions of CALJIC Nos. 8.11 and 8.31.

### 2. *Discussion*

We will attempt to state appellant's contention. Appellant begins by tracing the history of instruction on the concept of implied malice. That history is succinctly described in *People v. Nieto Benitez* (1992) 4 Cal.4th 91 [13 Cal.Rptr.2d 864, 840 P.2d 969]. The court noted instruction on implied malice has undergone an evolutionary process rendering an opaque statutory definition into plain, understandable language. Courts first concluded that an instruction using the statutory language, i.e., implied malice exists when a killing is done with " 'an abandoned and malignant heart,' " was adequate. (*Id.* at p. 103.) Later, however, it was decided such language was misleading and "too cryptic." (*Ibid.*)

In the wake of that decision, two lines of cases developed. One stated malice could be implied where " 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' " (*People v. Nieto Benitez, supra,* 4 Cal.4th at pp. 103-104.) The other stated malice could be implied where the killing was caused by " ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Id.* at p. 104.)

---

[2]Appellant contends counsel also sought additional language from the 1983 version of CALJIC Nos. 8.11 and 8.31, i.e., the act was done with "a high probability that it will result in death." We find no such request in the record.

Our Supreme Court concluded the two definitions "actually articulated one and the same standard." (*People v. Nieto Benitez, supra,* 4 Cal.4th at p. 104.) The court made clear, however, that while technically adequate, the "wanton disregard language" was "obscure phraseology" and that the better practice was to instruct solely using the "straight forward" language of the "conscious disregard" formulation. (*Ibid.*)[3] That definition forms the basis for the standard CALJIC instructions given in the present case.

The core of appellant's argument seems to be that because of the unique nature of an implied malice murder arising from a surgical procedure, the standard CALJIC instructions are inadequate and amount essentially to a directed verdict of second degree murder. He argues the instruction in the surgical context could be made clear by use of the "antisocial motive," "wanton disregard" language our Supreme Court and other courts have found "obscure" and confusing. He reasons that since every surgery is an intentional act and since all surgery is potentially dangerous to life, every surgeon—however competent and conscientious—is guilty of implied malice murder when a patient dies as the result of surgery since with knowledge of the danger the surgeon acted with conscious disregard for the patient's life. Thus, he argues in a murder case arising from a surgical procedure, a surgeon defendant is, in light of CALJIC instruction Nos. 8.11 and 8.31, ipso facto, guilty of murder.

Appellant is clearly mistaken. A licensed surgeon, performing a medically acceptable procedure on an appropriate patient, with standard preoperative, operative, and postoperative care, does not act with conscious disregard for the patient's life. The whole point of appropriate, competent surgery is that it is done with *conscious regard* for the patient's life. Conscious disregard in the context of implied malice essentially means indifference to a subjectively understood danger to life. The standard CALJIC instructions on implied malice are as useful in cases arising from alleged inadequate medical care as in any other context. With the giving CALJIC Nos. 8.11 and 8.31 and instructions on the lesser included offense of involuntary manslaughter, the jurors were fully equipped to consider all verdicts, including not guilty, reasonably possible under the facts and no verdict was directed to them.

C.  *CALJIC No. 17.41.1*

■  Appellant argues the trial court erred in instructing the jury in the terms of CALJIC No. 17.41.1. Appellant contends the instruction improperly

---

[3]It has also been concluded that the "base, antisocial motive" component of the formulation is both confusing and unnecessary. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1352-1353 [37 Cal.Rptr.2d 304].)

intrudes on a juror's power of nullification and has the potential to disrupt deliberations. That instruction states: "The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on [penalty or punishment, or] any [other] improper basis, it is the obligation of the other jurors to immediately advise the court of the situation."

Insofar as appellant's arguments are based on a juror's right of nullification, they are meritless in light of our Supreme Court's decision in *People v. Williams* (2001) 25 Cal.4th 441 [106 Cal.Rptr.2d 295, 21 P.3d 1209], concluding there is no such right.

The general propriety of CALJIC No. 17.41.1 is currently pending before the California Supreme Court. (See, e.g., *People v. Taylor* (2000) 80 Cal.App.4th 804 [95 Cal.Rptr.2d 357], review granted Aug. 23, 2000, S088909; *People v. Engelman* (2000) 77 Cal.App.4th 1297 [92 Cal.Rptr.2d 416], review granted Apr. 26, 2000, S086462.)

Even if giving the instruction is error, no reversal is required since appellant has failed to demonstrate prejudice. There is no indication any juror intended to act contrary to the law or that CALJIC No. 17.41.1 had any effect on this case whatsoever. (See *People v. Molina* (2000) 82 Cal.App.4th 1329, 1336-1337 [98 Cal.Rptr.2d 869].)

D.  *Great Bodily Injury Enhancement*

■  Appellant argues the trial court erred in failing to strike the section 12022.7, subdivision (c), great bodily injury enhancement attached to his conviction in count 2 of the unlawful practice of medicine (Bus. & Prof. Code, § 2053). Appellant notes that a great bodily injury enhancement pursuant to Penal Code section 12022.7, subdivision (c), cannot be applied to an offense an element of which is the infliction of great bodily injury. He argues the infliction of great bodily injury is an element of the unlawful practice of medicine and the enhancement should have been stricken. Appellant is mistaken.

Section 12022.7, subdivision (c), provides an enhancement for the person who "personally inflicts great bodily injury . . . unless infliction of great bodily injury is an element of the offense of which [the defendant] is convicted."

In pertinent part Business and Professions Code section 2053 states: "Any person who willfully, under circumstances or conditions which *cause or*

*create risk of great bodily harm*, serious physical or mental illness, or death" practices medicine without proper certification is punishable by imprisonment in county jail or state prison.

Citing to authority holding that a section 12022.7 great bodily injury enhancement may not be applied to a conviction of mayhem (§ 203) since an element of that offense is the infliction of great bodily injury, appellant argues it was improper to attach a section 12022.7 enhancement to his offense. (See *People v. Pitts* (1990) 223 Cal.App.3d 1547, 1558-1559 [273 Cal.Rptr. 389].)

The analogy does not apply. Mayhem cannot be committed without the infliction of great bodily injury. The sentence prescribed for mayhem, therefore, necessarily includes consideration of the injury and it would be an application of double punishment to apply a great bodily injury enhancement to it. The crime of unlawfully practicing medicine, on the other hand, is complete when the circumstances create the *risk* of great bodily harm. Indeed, the crime can be committed when the circumstances cause or risk not physical harm, but mental illness. Thus, while the crime may be committed when bodily injury is caused, the punishment prescribed for the crime does not include punishment for such bodily injury. The infliction of great bodily injury is not an "element" of a violation of Business and Professions Code section 2053.

Our conclusion is supported by cases dealing with the application of section 12022.7 to felonious assaults. In *People v. Smith* (1981) 122 Cal.App.3d 581 [176 Cal.Rptr. 73], the defendant argued it was error to increase the sentence for his conviction of felonious assault (§ 245, subd. (a)) with a great bodily injury enhancement pursuant to section 12022.7 since the infliction of great bodily injury was an element of the crime. (122 Cal.App.3d at pp. 586-587.)

The court rejected the contention. It noted the charged assault was "directed at punishment of the *use* of deadly weapons or acts of force *which create a danger* of serious injury to the victim." (*People v. Smith, supra,* 122 Cal.App.3d at p. 587.) It noted the crime was concerned with force likely to produce harm. It noted the crime was completed upon the attempted use of force while section 12022.7 was completed only on infliction of the harm. (*Smith, supra,* at p. 587; see *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 837 [159 Cal.Rptr. 771].)

The trial court in this case was not required to strike the finding of great bodily injury.

The judgment is affirmed.

Huffman, J., and Nares, J., concurred.

A petition for a rehearing was denied August 23, 2001, and appellant's petition for review by the Supreme Court was denied November 14, 2001.