Filed 9/25/15  P. v. Palomares CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VICTOR MANUEL PALOMARES et al.,<br><br>    Defendants and Appellants. | F066360 & F066576<br><br>(Super. Ct. Nos. BF135994A &<br>BF135994C)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant Victor Manuel Palomares.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant Oscar J. Martinez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Peter W. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellants Victor Manuel Palomares and Oscar J. Martinez were tried jointly and convicted of various offenses arising out of an incident in March 2011 in a restaurant parking lot in Kern County. They contend the trial court committed several prejudicial errors, including: admission of gang expert evidence and postarrest statements; instructing the jury with CALCRIM Nos. 600 and 3472; denial of their *Batson/Wheeler*[1] motion; and imposition of a three-year term for the Penal Code[2] section 12022.7 enhancement. They also contend the evidence is insufficient to support the gang offense conviction under section 186.22, subdivision (a).

We conclude appellants have waived[3] some issues; some issues lack merit; and in other instances, any error was nonprejudicial. We will affirm the judgments.

## FACTUAL AND PROCEDURAL SUMMARY

Essam Hashem arrived at the Maria Bonita Restaurant in Kern County with his brother and three friends at about 11:00 p.m. on March 11, 2011, for a birthday party. Hashem knew some people at the restaurant, including Chris Rodriguez, but there were also people he did not know. Hashem did not see any fights inside the restaurant, or hear anyone talking about a fight. Later, when everyone started to leave, Hashem went outside.

Hashem saw two large groups of people in the parking lot and knew there was going to be a fight. Hashem saw Rodriguez and two other people approach a couple of men who were walking toward them; a fight started. As Hashem was backing away from

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[2] References to code sections are to the Penal Code unless otherwise specified.

[3] We use the term "waiver" throughout this opinion even though the correct term is "forfeiture," because the parties and court opinions cited occasionally use the terms interchangeably. (*In re Sheena K.* (2007) 40 Cal.4th 881, fn. 1.)

the fight, he was shot in the back. He also was stabbed twice after being shot, but he did not see who stabbed him. Hashem was confined to a wheelchair after being shot.

Tariqu Murshed arrived at the restaurant with Hashem. Later, as he was leaving the restaurant with the group that attended the party, he noticed a big fight in the parking lot. He stayed away from the fight, heard three gunshots, and ran to his car. He could not leave though, because Hashem had not shown up at the car. One of his friends, Eric Rivera, came and told Murshed that Hashem was lying on the ground in the parking lot.

Richard Martinez[4] arrived at the restaurant around 10:30 p.m. for the birthday party. Around 1:30 a.m., he noticed people "getting in little groups" and thought something was going to happen. Richard noticed the security guards telling everyone to leave, so he and his friends left. Neither he nor his friends had any weapons.

As Richard left the restaurant, he noticed two groups in the parking lot and thought he "heard them saying" gang signs, or names. Richard noticed Rodriguez in one of the two groups and things were being yelled by both groups. Richard could tell the two groups were going to fight by the way they were setting up and yelling at one another. The only person Richard recognized in the fight was Rodriguez.

The fight looked to Richard to be mutual combat. The group that did not include Rodriguez was yelling "Colonia." Not long after the fight started, Richard heard three gunshots and noticed a white or silver truck. After the first gunshot, Richard saw Hashem on the ground. He took off toward the truck; looked around to see where another friend, Andre Onsurez was; and saw Onsurez on the ground. Richard ran to Onsurez and told him to get up; when Onsurez did not respond, Richard lifted up Onsurez's shirt and saw a bullet wound. Onsurez was dead from the gunshot to his chest.

---

**4** We will refer to Richard Martinez as Richard in this opinion, in order to avoid confusion with appellant Oscar Martinez.

Julyessa Gamez was at the restaurant. When security told everyone to leave, she went out to her car and realized a fight had started. A gunshot rang out; Gamez looked around and saw a flash coming from the driver's side window of a truck. Gamez identified the truck from where the gunshots emanated; it was appellant Martinez's truck.

Vanessa Mendez, Rodriguez's girlfriend, also was at the restaurant. When she was leaving the restaurant at closing, she saw a big group of guys and a fight break out in the parking lot. She heard gunshots, but could not tell from where the shots were fired.

Jacob Aguilar also was at the restaurant when the fight broke out; neither he nor any of his friends were involved in the fight. When they walked out of the restaurant, Aguilar heard gunshots and saw that the shots were fired from a truck.

Diego Gutierrez was a security guard at the restaurant. On the evening of March 11–12, 2011, the restaurant closed around 1:30 a.m. Gutierrez started toward the front door, encouraging people to leave. He noticed people were gathering in the parking lot and a fight was starting. Someone called his name and he looked away from the group that was fighting; at that point he heard a gunshot. As he tried to keep patrons from leaving the restaurant, Gutierrez heard another gunshot. Gutierrez called 911. He did not see the shots being fired, but believed the suspects left the parking lot in a gray truck.

Gustavo Siordia arrived at the restaurant with his friend, appellant Martinez. They arrived in Martinez's gray pickup truck. Siordia, Martinez, and Jered Caywood were drinking and playing pool; Palomares arrived about an hour later and joined them. Siordia heard people screaming "west side" while he was on the dance floor; there was tension in the room.

When Siordia exited the restaurant with his friends, there already were about 15 males standing in the parking lot. Siordia told the others something was "gonna trip" and Siordia and Martinez walked toward Martinez's truck; Palomares and Caywood

4.

continued walking into the parking lot toward the group of males. Martinez got into the driver's seat and drove to where Palomares and Caywood were fighting.

Siordia told Martinez that Caywood and Palomares were getting jumped; they were being hit and kicked by people, but no one was using a weapon. Martinez pulled a gun from the center console, fired a shot into the air, and then fired a second shot. Siordia saw someone fall to the ground after the second shot. After the second shot, some people backed off, but others continued fighting.

Siordia got out of the truck and heard another gunshot. He grabbed Palomares and told Caywood, "we gotta go." Siordia did not see Palomares with a knife, but saw blood on his shirt and hands. He also saw Martinez start to drive off, but then stop to shoot a man approaching the truck; the man was not a part of the fight and he did not have a weapon. Siordia, Caywood, Palomares, and Martinez all "used to" "hang out with Colonia" members.

While at the restaurant, Rodriguez was sitting at a table with friends drinking beer; he had four or five beers. Rodriguez saw some people at the restaurant that had stolen from his brother; Rodriguez was mad. While in the bathroom, Rodriguez talked about how something was going to happen and he "mad-dog[ged]" the person he did not like; the person was a "Mexican dude" with the first name Victor and the last name began with a "P."

When Rodriguez left the restaurant and was walking to his car, he noticed a crowd gathering in the parking lot. Rodriguez walked into the crowd, saw Palomares, and the fight broke out; he did not know who swung first. Rodriguez did not have a weapon. After swinging back and forth a couple times, Rodriguez heard a gunshot and broke apart from Palomares; he ran toward his car. When he got to his car, Rodriguez felt pain in his neck and back; he saw that he was bleeding. Rodriguez sustained five wounds in the fight.

Caywood did not see any fights or hear anyone talk about fighting while inside the restaurant. Caywood acknowledged being drunk when he walked out of the restaurant at closing time with Palomares. As they were walking out, somebody came up to Caywood and told him that somebody wanted to "get at me." Caywood and Palomares walked over to the group and Caywood asked, "[W]ho wants to get at me?" The group jumped them.

Palomares and Caywood were fighting side by side; the fight ended when they heard gunshots. Caywood ran over to Martinez's truck and he and Palomares climbed inside. Caywood noticed that Palomares had blood on his shirt. Palomares said something about "[s]tabbing people." As they were driving away, somebody approached the truck and Martinez shot the man. Caywood did not need medical attention after the fight.

The Bakersfield Police Department responded to multiple 911 calls it received about the parking lot fight. Photographs of Caywood revealed no injuries and a "KC" tattoo on his chest. A black hat recovered from the parking lot was the one worn by Palomares during the fight.

A search of Martinez's bedroom, consented to by his mother in his absence, disclosed two baseball caps with the letter "C" on them. Martinez was located the day after the fight while driving a silver Toyota Tacoma pickup truck. Palomares was at the residence to which Martinez had driven. Palomares and Martinez were placed under arrest.

After being placed under arrest and while being transported to jail, the transporting officer, Officer Beagley, asked Palomares why he had covered up the "C" tattoo on his neck with a rose tattoo. Palomares responded that he wanted to avoid a gang charge. Beagley noticed the rose tattoo was red and irritated, indicating to him that it was very recent. While Palomares was being booked, Beagley heard Palomares ask to be placed with the South in response to a question about whether he was associated with any gang.

6.

The Toyota Tacoma being driven by Martinez had bloodstains on the passenger seat, door, and headrest. Lab analysis showed that Rodriguez's blood was in the sample from the truck.

There was expert testimony to the effect that Martinez, Palomares, and Caywood were members of the Colonia Bakers, a subset of the Sureños. Sales of narcotics, possession of firearms, and witness intimidation are among the primary activities of the Colonia Bakers.

Police reports from 2009 and 2010 showed that Martinez had been in the company of Colonia Bakers gang members; regularly associated with Colonia Bakers members; had hats with the letter "C" on them; and a tattoo on his arm indicating association with the Sureños. In prior contacts with police before the restaurant parking lot fight, Palomares had acknowledged being a member of Colonia Bakers. Palomares also had been found to be in the presence of other Colonia Bakers members on previous occasions and had a "C" tattoo, which he had altered subsequent to the fight.

In response to a hypothetical consistent with the facts of this case, the gang expert opined that the fight, stabbing, and shooting were for the benefit of, at the direction of, or in association with the Colonia Bakers gang.

Martinez was convicted of the willful, deliberate, and premeditated murder of Onsurez; attempted murder of Hashem; attempted murder of Rodriguez; the gang offense set forth in section 186.22, subdivision (a); and being a felon in possession of a firearm. Palomares was found guilty of attempted involuntary manslaughter of Rodriguez; assault with a deadly weapon as to Rodriguez; and the gang offense. Amongst the enhancements found true was a section 12022.7 enhancement as to both Palomares and Martinez.

Palomares filed a notice of appeal on December 11, 2012, which was assigned case No. F066360. Martinez filed his notice of appeal on January 24, 2013, which was assigned case No. F066576. On its own motion, this court on March 27, 2013,

consolidated the two appeals under case No. F066360 and directed all documents be filed in that case.

## DISCUSSION

### I. *BATSON/WHEELER* CHALLENGE

Palomares and Martinez contend the trial court erred when it denied their motion for a mistrial on the basis of *Batson/Wheeler* error. In a related argument, they contend the trial court erred when it failed to articulate express findings as to the truth of each of the prosecutor's stated reasons for exercising peremptory challenges. We disagree.

#### *Factual Summary*

Defense counsel moved for a mistrial on the grounds of *Batson/Wheeler* error after the People exercised nine of their 11 peremptory challenges against potential Hispanic jurors. At this point in time, there were 11 members of the jury confirmed, of which six were Hispanic.

The trial court confirmed that nine of 11 peremptory challenges had been exercised by the People against potential Hispanic jurors. The trial court stated that "the excusal of these jurors certainly gives rise to inference of discriminatory purpose." The People were asked to explain their rationale for excusing the Hispanic jurors. The People noted that the defense had exercised all 12 peremptory challenges against white jurors and that six of the 11 seated jurors were Hispanic and accepted by the People.

The People offered specific reasons for excusing each of the jurors, but in this appeal Palomares and Martinez claim the People's rationale was pretextual as to Dr. Ortiz; Martinez also claims the rationale was pretextual as to Dr. Nguyen, Romero Aguilar, Melissa Sanchez, and Adriana Camacho.

#### *Standard of Review*

Federal law following *Batson* holds that exercising peremptory challenges solely on the basis of race offends the Fourteenth Amendment's guaranty of the equal protection of the laws (*United States. v. Martinez-Salazar* (2000) 528 U.S. 304, 315), and *Wheeler*

8.

holds that such conduct violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution (*Wheeler*, *supra*, 22 Cal.3d at pp. 276–277).

Excluding even a single prospective juror for reasons impermissible under *Batson* and *Wheeler* requires reversal. (*People v. Silva* (2001) 25 Cal.4th 345, 386 (*Silva*).) And although a party may exercise a peremptory challenge for any permissible reason or no reason at all (*Purkett v. Elem* (1995) 514 U.S. 765, 768 (*Purkett*); *People v. Jones* (1998) 17 Cal.4th 279, 294), "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." (*Purkett*, *supra*, at p. 768.)

In evaluating a trial court's *Batson/Wheeler* ruling that a party has offered a race-neutral basis for subjecting particular prospective jurors to peremptory challenge, we are mindful that "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' [Citations.]" (*Purkett*, *supra*, 514 U.S. at p. 768; see *Silva*, *supra*, 25 Cal.4th at pp. 384–385.)

In a case in which deference is due, "The trial court's ruling on this issue is reviewed for substantial evidence. [Citation.]" (*People v. McDermott* (2002) 28 Cal.4th 946, 971.) At trial, the court and counsel follow a three-step constitutional analysis of peremptory challenges. First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, if the defendant makes out a prima facie case, the burden shifts to the prosecution to give an adequate explanation of the peremptory challenges by offering permissible neutral justifications. Third, if a neutral explanation is tendered, the trial court must decide whether the opponent of the peremptory challenges has proved purposeful discrimination. (*Johnson v. California* (2005) 545 U.S. 162, 168.)

Our duty after denial of a *Batson/Wheeler* motion without a finding of a prima facie case is to consider the entire voir dire record before us. Since *Batson/Wheeler* motions require a trial court's personal observations, we give considerable deference to

9.

the trial court's rulings. (*People v. Howard* (1992) 1 Cal.4th 1132, 1155.) If the record suggests grounds on which the prosecutor reasonably might have challenged the prospective jurors at issue, our duty is to affirm. (*Ibid.*)

It is presumed that the prosecutor uses peremptory challenges in a constitutional manner. We defer to the trial court's ability to distinguish "bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.) As long as the trial court makes "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" (*Ibid.*)

The party seeking to justify a suspect excusal need only offer a genuine, reasonably specific race- or group-neutral explanation related to the particular case being tried. (*People v. Fuentes* (1991) 54 Cal.3d 707, 718 (*Fuentes*); *People v. Johnson* (1989) 47 Cal.3d 1194, 1216 (*Johnson*); *People v. Hall* (1983) 35 Cal.3d 161, 167–168; see *Batson*, *supra*, 476 U.S. at pp. 97–98 & fn. 20.) The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice. (*People v. Montiel* (1993) 5 Cal.4th 877, 910, fn. 9; *Johnson*, *supra*, at p. 1218.)

## *Analysis*

Here, race-neutral reasons for excusing the jurors are apparent from the record, and the prosecutor articulated race-neutral reasons for excusing each of the challenged jurors. That the prosecutor used many peremptory challenges to excuse Hispanics from the jury does not by itself establish a prima facie case. (See *People v. Box* (2000) 23 Cal.4th 1153, 1188–1189.)

When asked about prospective juror Romero Aguilar, the prosecutor noted that Aguilar had indicated he thought he had prior contact with one of the defendants, Martinez; had himself previously been convicted of a crime, driving under the influence; had a master's degree in social work and worked with gangs. The prosecutor opined that Aguilar might become a "closet expert" in the jury room and disregard the testimony of less educated police officers. These are race-neutral reasons that might not rise to the

level of a challenge for cause, but constitute valid reasons for exercising a peremptory. (*People v. Arias* (1996) 13 Cal.4th 92, 136.)

As for exercising a peremptory challenge against Dr. Nguyen, a non-Hispanic, the prosecutor noted that there would be medical records introduced into evidence in the case; the People did not intend to call medical doctors to testify and thought they might have to change trial strategy if Dr. Nguyen was on the jury; and the prosecutor felt that Dr. Nguyen could also become a jury room expert "where medical issues are in play." While appellants may not agree with the People's reasons for excusing Dr. Nguyen and perhaps even consider the reasons trivial, the reasons are race-neutral. (*People v. Arias*, *supra*, 13 Cal.4th at p. 136.)

The prosecutor indicated that she dismissed Jaime Ortiz, a psychiatrist who worked for the Department of Corrections, because Ortiz knew the victim went to Garces High School; Ortiz had strong connections to the high school; Ortiz did not directly answer the questions during voir dire, but instead rambled "on and on." The prosecutor felt that Ortiz might not listen to others in the jury room because of his tendency to keep talking and ramble on; and had concerns that Ortiz might become another jury room expert because of his education and his work with gangs for the Department of Corrections. A prosecutor may excuse a juror based upon """"hunches,"""" so long as the reason is not impermissible group bias. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122.) The prosecutor articulated race-neutral reasons for excusing Ortiz.

Adriana Camacho also was excused on a peremptory challenge by the prosecutor. Camacho's brother had been charged with a serious assault; Camacho did not believe her brother deserved the punishment he received from the criminal justice system; and Camacho had returned 25 minutes late from a lunch break during voir dire, which required everyone to wait for her to return before proceeding. The prosecutor also felt Camacho had a hostile attitude toward her, as demonstrated by Camacho having her arms crossed over her chest and an unpleasant look on her face when looking at the prosecutor.

11.

A peremptory challenge based upon a prospective juror's demeanor, or negative experience with the criminal justice system, are valid race-neutral reasons for exercising a peremptory challenge. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1203; *People v. Turner* (1994) 8 Cal.4th 137, 171, overruled on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.)

The prosecutor noted that when questioned during voir dire, Melissa Sanchez expressed concern about her ability to sit through a long trial; Sanchez was visibly nervous during voir dire; and Sanchez indicated it would be a financial hardship to serve on a jury as she worked as a school bus assistant. The prosecutor noted that Sanchez had been instructed by the trial court to check with her employer on whether she would be paid during her jury service; Sanchez came to court the next day having failed to follow the trial court's instruction. When the trial court instructed Sanchez to leave the courtroom and call her employer, she did; however, Sanchez was unable to clearly articulate the financial hardship and had difficulty expressing herself.

At one point, the trial court asked for a stipulation from all parties to dismiss Sanchez as a juror; the defense did not agree. The prosecutor thereafter exercised a peremptory challenge because she felt it was a potential hardship for Sanchez to serve on a jury; Sanchez had difficulty articulating and communicating her thoughts; and Sanchez expressed concern about being able to sit through a long trial. The prosecutor's reasons for excusing Sanchez—potential hardship and concern over ability to fulfill the role of a juror—are valid, race-neutral reasons for exercising a peremptory challenge. (*People v. Landry* (1996) 49 Cal.App.4th 785, 789; *People v. Davenport*, *supra*, 11 Cal.4th at p. 1203.)

Appellants wish us to engage in a comparative analysis regarding the prosecution's use, or failure to use, peremptory challenges on specific jurors. We do not engage in a comparative analysis of various juror responses to evaluate the good faith of the prosecutor's stated reasons for excusing a particular juror "because comparative

12.

analysis of jurors unrealistically ignores 'the variety of factors and considerations that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar.'" (*Fuentes*, *supra*, 54 Cal.3d at pp. 714–715, quoting *Johnson*, *supra*, 47 Cal.3d at pp. 1219, 1220.) "The purpose of peremptory challenges is to allow a party to exclude prospective jurors who the party believes may be consciously or unconsciously biased against him or her. [Citation.]" (*People v. Jackson* (1992) 10 Cal.App.4th 13, 17–18.)

"We accord great deference to a trial court's determination of the sufficiency of a prosecutor's explanations for exercising peremptory challenges. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 635, 666.) The focus of a *Batson/Wheeler* analysis is on the subjective genuineness of the reason, not the objective reasonableness. (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.)

After hearing the explanations for the use of peremptory challenges against specific prospective jurors, the trial court invited argument from both defense counsel. The trial court analyzed the prosecutor's responses and the challenged jurors' responses to voir dire and found "the People have offered permissible, credible race-neutral justifications" for dismissing the challenged jurors. We conclude substantial record evidence supports the trial court's ruling. Therefore, we will not reverse the trial court's denial of the *Batson/Wheeler* motion.

As for appellants' contention that the trial court had to articulate express findings on each of the prosecutor's proffered reasons for using a peremptory challenge, that simply is not the state of the law. The trial court is not required to make detailed or specific findings for the record to justify every instance in which a prosecutor offers a race-neutral reason for exercising a peremptory challenge. (*People v. Stanley* (2006) 39 Cal.4th 913, 936.)

Appellants cite to the dissenting opinion of Justice Liu in *People v. Williams* (2013) 56 Cal.4th 630, 699–728, and his concurring opinion in *People v. Mai* (2013) 57 Cal.4th 986, 1058–1076, to support their contention. Justice Liu's dissent and concurring

opinion on this point, however, do not express the views of the majority of the California Supreme Court on this issue; none of the other justices joined in the concurrence in *Mai* and in *Williams*, at pages 698–699, Justice Werdeger joined Justice Liu in dissenting, but she did not agree that a trial court has to make explicit findings on the prosecutor's reasons for exercising peremptory challenges.

The trial court was not required to question the prosecutor further or make detailed, express findings before denying the *Batson/Wheeler* motion. (*People v. Allen* (2004) 115 Cal.App.4th 542, 548.)

## II.    MOTION TO SUPPRESS

Palomares contends the trial court erred in denying his motion to suppress his postarrest statements made in response to questions from an officer. He asserts the statements were obtained in violation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). The People contend admission of the statements was not error. We agree with Palomares that the trial court erred in ruling the statements admissible; however, the error was not prejudicial.

### *Factual Summary*

On the evening of March 16, 2011, Officer Peter Beagley was one of the officers that went to arrest Palomares. A warrant had been issued for the arrest of Palomares on murder, attempted murder, and gang charges. Beagley had been told in the briefing that Palomares had a large "C" tattoo on his neck.

Palomares was in handcuffs and in the back seat of Beagley's patrol car. Beagley and his partner were transporting Palomares to the jail; Palomares was under arrest at the time. On the way to the jail, Palomares asked Beagley what the charges were; Beagley told him. Palomares asked if he was being transported to jail; Beagley responded affirmatively.

Beagley did not see a "C" tattoo on Palomares; instead he saw a large tattoo of a flower. Beagley asked Palomares why he had covered up the "C" tattoo. Palomares told

14.

Beagley he had it covered up because he did not want a gang charge. Beagley asked about the significance of the flower tattoo. Palomares responded that it had no significance; it was merely a cover up for the Colonia tattoo.

The trial court stated that in determining whether police conduct constitutes an interrogation, "the California Supreme Court seems to focus on police intent." The trial court then concluded that looking at the officer's stated intent and the "total situation," Beagley's questioning of Palomares about the tattoo was not an interrogation and the statements were admissible.

### *Standard of Review*

In ruling on a motion to suppress, "'"'the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. We review the court's resolution of the factual inquiry under the deferential substantial evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review.'"'" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364–365.) On appeal, we consider the correctness of the trial court's ruling itself, not the correctness of the reasons as articulated by the trial court. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145.)

### *Analysis*

Here, the historical facts are not in dispute: Palomares was in custody and Beagley initiated questioning. A police officer may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response. (*People v. Cunningham* (2001) 25 Cal.4th 926, 993.) "In deciding whether police conduct was reasonably likely to elicit an incriminating response from the suspect, we consider primarily the perceptions of the suspect rather than the intent of the police." (*People v. Davis* (2005) 36 Cal.4th 510, 554.)

15.

The trial court applied an erroneous standard in evaluating whether the exchange between Beagley and Palomares was an interrogation and, therefore, not admissible. The trial court focused on the stated police intent, which according to Beagley was mere curiosity, instead of whether the questions were reasonably likely to elicit an incriminating response. (*People v. Davis*, *supra*, 36 Cal.4th at p. 554.)

Regardless of the stated intent behind Beagley's questions, asking a suspect about gang indicia—why Palomares covered up the "C" tattoo on his neck—was reasonably likely to elicit an incriminating response. Beagley not only asked about gang indicia, he did so knowing that Palomares was facing gang-related charges. (*People v. Davis*, *supra*, 36 Cal.4th at p. 554.) One cannot question a suspect in custody facing gang-related charges about gang indicia without a reasonable expectation of eliciting an incriminating response. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 993.)

Our application of the undisputed facts to the relevant rule of law leads us to conclude that Beagley's questions constituted an impermissible interrogation likely to elicit an incriminating response. (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 364–365.) As such, the exchange was not admissible and the trial court erred in admitting the remarks into evidence. (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 145.)

Beagley's observation that the flower tattoo on Palomares's neck appeared red and irritated, indicating to him that it was a fresh tattoo, was admissible, as it was the result of an observation and not an interrogation.

### *No Prejudice*

Palomares contends the admission of his remarks about the tattoo were prejudicial. The prosecutor urged the jury to consider the postarrest statements as consciousness of guilt as to the stabbing and the gang offense. Palomares asserts that it is likely the jury viewed his remarks as "tantamount to a confession as to the substantive gang offense and, as the prosecutor suggested in final argument, a clear sign that he had just 'stabbed

16.

someone.'" The People contend admission of the remarks was not prejudicial because Palomares's gang membership was established by many other sources and they dispose of the prejudice argument in one sentence.

A conviction may be affirmed despite the erroneous admission of evidence obtained in violation of *Miranda* if the error was harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 295–296; *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Cahill* (1993) 5 Cal.4th 478, 509–510.) Here, we conclude that other properly admitted evidence renders the error was harmless beyond a reasonable doubt.

Caywood testified that Palomares was a member of the Colonia gang. Testimony was presented that officers found Palomares in the company of known members of the Colonia gang during prior street contacts, including at least one instance where Palomares admitted being a member of the Colonia gang. The Colonia gang was a subset of the Sureños. Palomares previously had asked to be kept away from Northerners when booked into jail; he claimed to belong to the "South," another term for Sureño.

Beagley's observation that the flower tattoo on Palomares's neck appeared to be a fresh tattoo because it was red and irritated, was admissible as it was the result of an observation, not an interrogation. Other testimony noted that Palomares previously had a large "C" tattoo on his neck, which had been obscured by a flower tattoo. With this admissible evidence that the "C" tattoo was obscured by a fresh flower tattoo that appeared on Palomares's neck shortly after the incident, the prosecutor fairly could argue and a jury reasonably could conclude that the tattoo was altered in order to avoid gang identification and related charges.

As for the stabbing, Rodriguez testified he and Palomares were fighting; Rodriguez did not have any weapons. After a few swings back and forth with Palomares, Rodriguez heard a gunshot; he broke away from Palomares and ran toward his car. Rodriguez was bleeding underneath his armpit after the fight with Palomares; he felt pain

in his neck and left side. Rodriguez sustained about five wounds in the fight with Palomares. Siordia saw Palomares immediately after he broke off fighting with Rodriguez; Palomares had blood on his shirt and hands. After Palomares and the others left the scene of the fight, Caywood noticed that Palomares had blood on his shirt. Palomares said something to Caywood about "stabbing people." This evidence is strong evidence that Palomares stabbed Rodriguez, irrespective of any alteration of the tattoo.

In light of properly admitted evidence, we conclude the erroneous admission of pretrial statements made by Palomares in response to improper questioning from Beagley was harmless beyond a reasonable doubt. (*Arizona v. Fulminante*, *supra*, 499 U.S. at pp. 295–296; *Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Cahill*, *supra*, 5 Cal.4th at pp. 509–510.)

## III.   GANG OFFENSE

Palomares contends there is insufficient evidence to support his conviction for violating section 186.22, subdivision (a), the gang offense, because the two substantive offenses of which he stands convicted are assault with a deadly weapon and attempted voluntary manslaughter against Rodriguez. Palomares contends no other gang member participated in either of these offenses; therefore, the conviction cannot stand. Martinez joins in this contention in a cursory fashion, with no analysis or citation to authority.

We conclude Martinez has failed to properly assert this issue on appeal. As for Palomares, we reject his contention.

### *Martinez Analysis*

We first dispense with Martinez's claim. In their brief, the People argued that Martinez's cursory joinder was insufficient to raise the issue as to him; that some analysis of the facts and relevant authority needed to be set forth to comply with the applicable Rules of Court. (Cal. Rules of Court, rules 8.200(a)(5), 8.204(a) & 8.630(a).) Martinez's reply brief failed to provide any analysis of facts or applicable law as to him with regard to this issue.

18.

If a party has failed to provide legal argument and citation to authority, we may deem the issue waived. A cursory, one-sentence joinder without providing any facts or argument specific to Martinez is insufficient under the rules and case authority to raise this issue as to Martinez. (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 363–364.) Therefore, Martinez has waived this issue. (*Ibid.*)

### *Palomares Analysis*

Palomares contends the evidence is insufficient to support the section 186.22, subdivision (a) gang offense because there is no evidence he acted in concert with any other gang member in committing a felony. Palomares argues the section 186.22, subdivision (a) conviction cannot stand because his felony convictions were for assault with a deadly weapon and attempted voluntary manslaughter against Rodriguez, both based upon his use of a knife, and no other Colonia Bakers gang member participated in those crimes. Palomares is incorrect.

Section 186.22, subdivision (a), punishes gang members who willfully promote, further, or assist in any felonious conduct by fellow gang members. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (*Rodriguez*).) While Palomares is correct that he alone stabbed Rodriguez, both he and Martinez were convicted of crimes against Rodriguez; Martinez was convicted of attempted murder of Rodriguez and Palomares of attempted manslaughter and assault with a deadly weapon against Rodriguez. Palomares would have us believe that he and Martinez did not intend to assist each other when they jointly attacked Rodriguez. Such an argument lacks credibility.

There were two groups in the parking lot of the restaurant; Rodriguez was in one group and Palomares and Martinez were part of the other group. Gang taunts were being yelled by both groups; the group that did not include Rodriguez was yelling Colonia. It was apparent to observers that a fight was about to start as the two groups moved toward each other.

Both attempted murder and attempted voluntary manslaughter have as one of their elements an intent to kill. (*People v. Souza* (2012) 54 Cal.4th 90, 120 [element of attempted murder is intent to kill victim]; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1243–1244 [element of voluntary manslaughter is intent to kill another person].) Here, both Palomares and Martinez attacked Rodriguez and were ultimately convicted of offenses against Rodriguez that required an intent to kill. A reasonable jury certainly could conclude that the two acted with the intent to willfully promote, further or assist felonious conduct by the other when they attacked Rodriguez.

We disagree with Palomares's implied position that two gang members must engage in exactly the same conduct, and presumably be convicted of exactly the same felony, in order for the section 186.22, subdivision (a) offense to be upheld. We do not view *Rodriguez* as so limiting. In fact, *Rodriguez* discusses a hypothetical situation where one gang member shoots a rival with a gun provided by a fellow gang member. Although only one gang member fired the weapon, both are guilty of violating section 186.22, subdivision (a). (*Rodriguez*, *supra*, 55 Cal.4th at p. 1138.)

Additionally, in *People v. Infante* (2014) 58 Cal.4th 688, the California Supreme Court indicated that application of section 186.22, subdivision (a) was not necessarily dependent upon whether the underlying felony that constituted the felonious criminal conduct element of that subsection was separately charged. (*People v. Infante*, *supra*, at pp. 694–695 & fn. 2.)

Furthermore, in *People v. Johnson* (2013) 57 Cal.4th 250, the California Supreme Court upheld section 186.22, subdivision (a) convictions where gang members agreed to commit various shootings that were carried out by multiple gang members, finding that the agreement to commit various different acts constituted an agreement to commit the gang participation offense set forth in section 186.22, subdivision (a), and once an overt act was committed, a felony conspiracy under section 182.5 also was committed. (*People v. Johnson*, *supra*, 57 Cal.4th at pp. 266–267.)

20.

We conclude the evidence is sufficient to uphold the section 186.22, subdivision (a) gang offense conviction.

## IV.    GANG EXPERT TESTIMONY

Martinez contends admission of gang expert testimony violated his confrontation clause rights because the gang expert relied extensively on police reports in forming his opinion that Martinez was a gang member.  Palomares purports to join in the issues raised by Martinez, but fails to provide any factual or legal analysis of the issue as to him.

Palomares has failed to properly raise this issue as to him.  Martinez is incorrect; there was no confrontation clause violation.

### *Palomares Analysis*

We first dispense with Palomares's claim.  In their brief, the People argued that Palomares's cursory joinder was insufficient to raise the issue as to him; that some analysis of the facts and relevant authority needed to be set forth to comply with the applicable Rules of Court.  (Cal. Rules of Court, rules 8.200(a)(5), 8.204(a) & 8.630(a).)  Palomares's reply brief failed to provide any analysis of facts or applicable law as to him with regard to this issue.

If a party has failed to provide legal argument and citation to authority, we may deem the issue waived.  A cursory, one-sentence joinder without providing any facts or argument specific to Palomares is insufficient under the rules and case authority to raise this issue as to Palomares.  (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 363–364.)  Therefore, Palomares has waived this issue.  (*Ibid.*)

### *Martinez Analysis*

Martinez concedes that *People v. Gardeley* (1996) 14 Cal.4th 605 held it was permissible for gang experts to use otherwise inadmissible hearsay as a basis for forming their opinion and it did not violate the confrontation clause.  He contends, however, that we should hold otherwise.  We decline to do so.

The confrontation clause is only implicated by testimonial statements. (*Michigan v. Bryant* (2011) 562 U.S. 344, 353–354 [131 S.Ct. 1143, 1152–1153]; *Crawford v. Washington* (2004) 541 U.S. 36, 68–69; *People v. Gutierrez* (2009) 45 Cal.4th 789, 812.) Otherwise inadmissible hearsay evidence considered by a gang expert in forming an opinion is considered basis evidence. The purpose of basis evidence is to reveal the basis for the expert opinion and to evaluate the weight of that opinion; it is not offered for the truth of the matters asserted. (*People v. Gardeley*, *supra*, 14 Cal.4th at pp. 618–619.)

Because basis evidence is not offered for the truth of the matters asserted therein, it is not testimonial and its admission into evidence does not violate the confrontation clause. (*People v. Gardeley*, *supra*, 14 Cal.4th at p. 619.) This court is required to follow California Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) As such, we decline to differ from the holding of *Gardeley.*

## V.    INSTRUCTIONAL ISSUES

Martinez contends the trial court erred when it instructed the jury with CALCRIM No. 600, attempted murder, and included the language regarding the "'kill zone'" theory of murder. Palomares contends the trial court erred when it instructed the jury with CALCRIM No. 3472, right to self-defense may not be contrived, because it was not supported by the evidence. They each, in a summary fashion, joined the argument raised by the other appellant.

### *Improper Joinder*

As we noted previously, some analysis of the facts and relevant authority needed to be set forth to comply with the applicable Rules of Court with respect to joinder. (Cal. Rules of Court, rules 8.200(a)(5), 8.204(a) & 8.630(a).) A simple, one-sentence statement that an appellant is joining in an issue is insufficient to preserve the issue as to that appellant.

If a party has failed to provide legal argument and citation to authority, we may deem the issue waived. A cursory, one-sentence joinder without providing any facts or

argument specific to the appellant asserting joinder is insufficient under the rules and case authority to raise the issue as to that appellant. (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 363–364.) Therefore, Martinez has waived any issue as to CALCRIM No. 3472 as to him; and Palomares has similarly waived any issue as to CALCRIM No. 600 as to him. (*People v. Bryant, Smith and Wheeler*, *supra*, at pp. 363–364.)

### A. <u>CALCRIM No. 600</u>

Martinez contends instructing the jury with the "'kill zone'" language from CALCRIM No. 600 was prejudicial error because attempted murder requires a specific intent to kill and firing a gun in the direction of a group of people may evidence lack of concern for human life, but does not equate to a specific intent to kill. We disagree.

Palomares summarily joins in this argument. Because Palomares was not convicted of attempted murder, the issue is inapplicable to him.

### *Factual Summary*

Martinez was convicted of the attempted murders of Hassem and Rodriguez. The evidence established that when Palomares and Caywood walked out to the parking lot, they ended up in a fight. When Rodriguez walked out to the parking lot, he saw a crowd in the parking lot and walked toward it. When he saw Palomares in the crowd, the fight broke out. Palomares and Caywood were next to each other, fighting with several people. The fight ended when gunshots were heard; Caywood and Palomares ran over to Martinez's truck. As Martinez, Caywood, and Palomares were driving away, someone ran toward the truck and Martinez shot him.

Martinez was charged and convicted of the attempted murders of Hashem and Rodriguez. The jury was instructed with CALCRIM No. 600, which included the following language:

> "A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or 'kill zone.'

In order to convict [Martinez] of the attempted murder of Essam Hashem in count 2 and/or Christopher Rodriguez in count 3, the People must prove that [Martinez] not only intended to kill anyone fighting with his friends but also either intended to kill Essam Hashem in count 2 and/or Christopher Rodriguez in count 3 or intended to kill everyone in the kill zone. If you have a reasonable doubt whether [Martinez] intended to kill Essam Hashem in count 2 and/or Christopher Rodriguez in count 3 or intended to kill anyone fighting with his friends by killing everyone in the kill zone then you must find [Martinez] not guilty of the attempted murder of Essam Hashem in count 2 and/or Christopher Rodriguez in count 3."

In the discussions on jury instructions between counsel and the trial court, it was noted that neither defense counsel submitted any jury instructions. When addressing the verdict forms and instructions to be given on the two attempted murder charges, there was no objection to the language of the proposed instructions, including CALCRIM No. 600, that addressed attempted murder. When the final jury instructions discussions took place, again there was no objection and no request for any modification of the proposed CALCRIM No. 600.

During closing argument, there was no argument from the prosecutor that Martinez intended to kill anyone other than Hashem and Rodriguez, or any reference to kill zone.

## Analysis

Despite Martinez's argument that firing a gun in the direction of a group, as Martinez did here, does not equate to an intent to kill, it *can* equate to an intent to kill. The kill zone language of the instruction is designed to address those situations where a defendant may intend to kill a specific person, but may also have a concurrent intent to kill others in the particular zone of risk, which is the "'kill zone.'" (*People v. Bland* (2002) 28 Cal.4th 313, 329.)

Although Martinez contends the trial court erred in instructing the jury with the kill zone language from CALCRIM No. 600, the kill zone theory is not a legal doctrine requiring special jury instructions; rather, "'it is simply a reasonable inference a jury may

draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others.'" (*People v. Stone* (2009) 46 Cal.4th 131, 137.)

It was for the jury to decide whether Martinez intended to kill Hashem and Rodriguez, either because he specifically intended to kill those two or because he intended to kill everyone in the particular kill zone. A person who intends to kill can be guilty of attempted murder, even if he has no specific target in mind. (*People v. Stone*, *supra*, 46 Cal.4th at p. 140.)

Even with the kill zone language in the instruction, the jury was required to find that Martinez *intended to kill* before they could return a verdict of guilty of attempted murder. CALCRIM No. 600 expressly so states, and the trial court so instructed the jury. Consequently, even if instructing the jury with the kill zone language were error because it was inapplicable to Martinez's case, it could not have resulted in the harm complained of by Martinez; the jury was properly instructed that there must be an intent to kill, not merely a finding that he fired a weapon into a group of people with no intent to kill. The jury was told that if they had a reasonable doubt as to whether Martinez had an intent to kill, they were to return a not guilty verdict on the attempted murder charges. Therefore, the error, if any, was harmless. (*People v. Perez* (2005) 35 Cal.4th 1219, 1233.)

### B.  CALCRIM No. 3472

Palomares contends the trial court erred prejudicially in instructing the jury with CALCRIM NO. 3472 because the instruction could be misapplied by the jury in a way that deprived Palomares of the defense of self-defense. Martinez joins in this issue.

*Factual Summary*

On October 26, 2012, when counsel and the trial court were discussing jury instructions, the prosecutor requested CALCRIM No. 3472 be given to the jury, along with other self-defense instructions. Counsel for Martinez conceded both CALCRIM Nos. 3471 and 3472 be given to the jury. Shortly thereafter, Martinez's counsel again stated that CALCRIM No. 3472 should be included in the jury instructions.

The trial court indicated it would be instructing the jury with the "3470 series" and Palomares's counsel responded, "Yes, sir." The trial court clarified that the series included CALCRIM Nos. 3470, 3471, 3472, and 3474. Neither defense counsel lodged an objection to any of these instructions.

The record reflects that the jury was instructed with CALCRIM No. 3472, which states: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." The jury also was instructed with that portion of CALCRIM No. 3471 that states: "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting."

## *Analysis*

We reject Martinez's claim of error for two reasons. First, he failed to provide legal argument and citation to authority, and we therefore deem the issue waived. A cursory, one-sentence joinder without providing any facts or argument specific to the appellant asserting joinder is insufficient under the rules and case authority to raise the issue as to that appellant. (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 363–364.)

Second, Martinez conceded in the trial court that the instruction should be issued to the jury. To the extent the self-defense instructions needed any clarification or amplification because of the facts of this case, failure to request such in the trial court forfeits any claim of error. (*People v. Moon* (2005) 37 Cal.4th 1, 29.)

As for Palomares, he also acquiesced in the giving of CALCRIM No. 3472. He now contends the instruction could have been misapplied by the jury. Any claim that the instruction should have been clarified for the jury has been forfeited by Palomares

26.

because he failed to request any clarification in the trial court and, instead, acquiesced in the issuing of the instruction. (*People v. Moon*, *supra*, 37 Cal.4th at p. 29.)

Regardless, instructing the jury with CALCRIM No. 3472 was not prejudicial. We evaluate whether an instruction is misleading by reviewing the jury charge as a whole. (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1237.) "The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) The correctness of jury instructions is to be determined from the entire charge to the jury. (*People v. Lucas* (2014) 60 Cal.4th 153, 282.) "An instruction can only be found to be ambiguous or misleading if, in the context of the entire charge, there is a reasonable likelihood that the jury misconstrued or misapplied its words. [Citation.]" (*People v. Campos*, *supra*, at p. 1237.)

In reviewing a claim of instructional error, we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions that are given. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) Juries are presumed to follow the trial court's instructions unless the record affirmatively indicates otherwise. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83.) When considering a claim that the trial court improperly instructed the jury, a reviewing court must determine whether there is a reasonable likelihood the jury construed or applied the instructions in an objectionable fashion. (*People v. Osband* (1996) 13 Cal.4th 622, 685–686.) We review all instructions given, not just the instruction complained of, to determine whether the jury charge as a whole was correct. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1249.)

Granted, the jury was informed that a defendant did not have the right to self-defense if he provoked the fight. The testimony at trial established that it was Rodriguez who "mad-dog[ged]'" Palomares while the two were in the restaurant and Rodriguez who made comments to others that "something was gonna happen." It was Rodriguez who

27.

walked toward the group of men, including Palomares, instead of going directly to his car when he left the restaurant. The fight broke out at that point. The evidence presented at trial portrayed Rodriguez as the instigator of the fight, not Palomares, or at most that it was mutual combat.

The jury also was instructed that if a defendant had a reasonable belief "there was imminent danger of violence," he was entitled to use reasonable force to protect himself or others. (See CALCRIM No. 3470.) CALCRIM No. 3471 also instructed the jury that a defendant engaged in mutual combat had a right to self-defense. A defendant only has the right to defend himself using deadly force, however, when his opponent has responded with deadly force. Here, Rodriguez did not have or use any weapon in his fight with Palomares except his fists; Palomares, on the other hand, pulled and used a deadly weapon, a knife.

We are aware that the Fourth District Court of Appeal in *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*) found it to be prejudicial to instruct the jury with CALCRIM No. 3472 in that case, concluding the jury was led to believe that an initial aggressor may never defend himself, even against deadly force. Its conclusion was based in large part on the prosecutor's argument to the jury; namely, that an aggressor never has the right to defend himself, even if he intended only to start a fistfight and his opponent escalated the fight by using deadly force. (*Ramirez*, *supra*, at p. 953.)

Such is not the case here. First, the People did not make the same argument as was made in *Ramirez*. Second, in the *Ramirez* case, a fistfight ensued during which the victim pulled out an object that looked like a gun and had it in his hand, causing the defendant to pull a weapon and shoot the victim. (*Ramirez*, *supra*, 233 Cal.App.4th at p. 945.) There is no evidence Rodriguez used deadly force that would have warranted Palomares escalating the fight by using a deadly weapon.

We presume the jury understood and correlated the self-defense instructions, and applied them to the facts of this case. (*People v. Richardson*, *supra*, 43 Cal.4th at

28.

p. 1028.)  Under the facts of this case, instructing the jury with CALCRIM No. 3472 was not prejudicial.

## VI.    GREAT BODILY INJURY ENHANCEMENT

Palomares contends the section 12022.7 great bodily injury enhancement must be stricken as the statute is not intended to apply to attempted voluntary manslaughter. Martinez purports to join in this contention.  We summarily dispense with Martinez's purported joinder.  Palomares's contention is flawed and we disagree with his position.

We reject Martinez's claim of error for two reasons.  First, there is no indication he objected to imposition of the section 12022.7 enhancement in the trial court, thereby forfeiting any claim of error.  (*People v. Neal* (1993) 19 Cal.App.4th 1114, 1117.) Second, he failed to provide legal argument and citation to authority, and we therefore deem the issue waived on appeal as to him.  A cursory, one-sentence joinder without providing any facts or argument specific to the appellant asserting joinder is insufficient under the rules and case authority to raise the issue as to that appellant.  (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 363–364.)

We also reject Palomares's claim of error for two reasons.  As with Martinez, there is no indication Palomares objected to imposition of this enhancement in the trial court; thus, any claim of error is waived.  (*People v. Neal*, *supra*, 19 Cal.App.4th at p. 1117.)  Second, his contention is legally flawed.

Palomares relies only on the dissenting opinion in *People v. Lewis* (1993) 21 Cal.App.4th 243 to support his position.  The prevailing opinion in *Lewis* and other cases is that a section 12022.7 enhancement may be appended to an attempted voluntary manslaughter conviction.  In *Lewis,* the appellate court upheld the imposition of a section 12022.7 enhancement appended to an attempted manslaughter conviction. (*People v. Lewis*, *supra*, at pp. 247–248.)  Subsequent to *Lewis,* the Legislature has not modified or amended section 12022.7 to list attempted murder or attempted manslaughter as exceptions to application of the statute.

29.

In *People v. Cross* (2008) 45 Cal.4th 58, the California Supreme Court indicated the Legislature intended for section 12022.7 to have broad application, with only limited exceptions set forth in the statute. (*People v. Cross*, *supra*, at p. 66, fn.3.) The exceptions set forth in the statute are murder, manslaughter, arson, and unlawfully causing a fire; attempts are not an exception. (§ 12022.7, subd. (g).)

In *People v. Brown* (2001) 91 Cal.App.4th 256, a section 12022.7 enhancement appended to a conviction for unlawful practice of medicine was upheld, even though the victim died and the defendant also was convicted of second degree murder. (*People v. Brown*, *supra*, at pp. 272–273.) Similarly, in *People v. Corban* (2006) 138 Cal.App.4th 1111, the appellate court upheld the imposition of a section 12022.7 enhancement appended to a conviction for child endangerment, even though the defendant also was convicted of involuntary manslaughter in the death of that same child. (*People v. Corban*, *supra*, at p. 1119.)

In *People v. Martinez* (2014) 226 Cal.App.4th 1169, the appellate court upheld the imposition of a section 12022.7 enhancement to a conviction for furnishing narcotics or dangerous drugs, even though the defendant also was convicted of manslaughter when the victim died as a result of ingesting the drugs. (*People v. Martinez*, *supra*, at p. 1186.)

There is nothing in the plain language of the statute, and no case cited by Palomares, that precludes imposition of a section 12022.7 enhancement on an attempted manslaughter or attempted murder conviction.

## DISPOSITION

The judgments are affirmed.

_____
KANE, Acting P.J.

WE CONCUR:


_____
DETJEN, J.


_____
PEÑA , J.

31.